[No. S004528. Crim. No. 23128. Aug. 30, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY JUNIOR WEBSTER, Defendant and Appellant.

[No. S007757. Aug. 30, 1991.]

In re LARRY JUNIOR WEBSTER on Habeas Corpus.

416

**Counsel**

Joseph D. Allen, under appointment by the Supreme Court, Allen & Allen and David K. Allen for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Arnold O.

Overoye, Assistant Attorney General, Jane N. Kirkland, Ward A. Campbell and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendant Larry Junior Webster and three other men were jointly tried on charges arising from the death of William Burke. A jury convicted defendant of first degree murder with personal use of a deadly and dangerous weapon (Pen. Code, §§ 187, 189, 12022, subd. (b)),[1] robbery (§ 211), conspiracy to commit first degree murder and robbery (§ 182, former subd. 1 [now subd. (a)(1)]), and grand theft of an automobile (former § 487, subd. 3 [see now § 487h]). Under the 1978 death penalty law, the jury found as special circumstances of the murder that defendant intentionally committed it while lying in wait (§ 190.2, subd. (a)(15)) and while engaged in the commission or attempted commission of a robbery (*id.*, subd. (a)(17)(i)). After a penalty trial, the jury fixed defendant's punishment at death. His motion for modification of the death verdict (§ 190.4, subd. (e)) was denied. Defendant's appeal is automatic.

We find no prejudicial error affecting either the guilt or penalty judgments. We will therefore affirm them in full.

Defendant has filed a separate petition for habeas corpus alleging (1) that his trial counsel rendered ineffective assistance in various respects and (2) that newly discovered evidence warrants guilt and penalty retrials. We conclude that the petition fails to state a prima facie case for relief. We will therefore deny the petition.

### GUILT TRIAL

1. *Prosecution evidence.*

The principal prosecution witnesses were Bruce Smith and Michelle Cram. As the jury knew, Smith had already pled guilty to second degree murder in connection with the homicide, and Cram had been granted immunity in return for her testimony.

Smith and Cram provided the following account, differing only in minor details: In late August 1981, defendant, Joseph Madrigal, Carl Williams, Robert Coville, Smith, and the 17-year-old Cram were living at a riverbank encampment in Sacramento. Defendant was the group leader. On the night of August 29, Smith, Madrigal, and Coville robbed a nearby convenience store.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

Quick response by the police forced the trio to hide for several hours before returning to camp.

The next day, August 30, defendant and Williams made one of several trips to buy beer, which the camp residents were consuming at a steady pace. When the men returned in early afternoon, defendant said they had met two "outlaws" ("street persons" or "survivors") at the Shell station near the convenience store. Defendant reported there was still intense police activity in the area because of the robbery, and he suggested the group needed to leave town. Defendant said he had arranged to use the "outlaws'" car for joint drug purchases or robberies that evening. The opportunity arose, he suggested, to lure one of the "outlaws" back to the camp, kill him, and steal the car.

Madrigal, Coville, and Williams expressed enthusiasm for the plan. According to Cram, defendant said he personally would kill and dismember the victim; according to Smith, Coville said he "hadn't killed somebody in quite a while" and would "take care of it." When Cram expressed skepticism about defendant's boasts, he insisted he was serious. Defendant said this would be Cram's first criminal lesson and would help her become more independent from Williams, with whom she was living.

It was decided that because the "outlaws" knew Williams, he would walk back to the Shell station with defendant to meet them. Madrigal would go along. Once the three returned to camp with the intended victim, either defendant (according to Cram) or Coville (according to Smith) would kill him. Defendant showed Smith where to dig a grave and told Cram to clean up the campsite and pack in preparation for the group's departure. Defendant, Williams, and Madrigal then left for a 7:30 p.m. meeting with the "outlaws." Defendant had drunk beer all day and may have taken amphetamines. As usual, defendant was wearing glasses; Williams wore a cowboy hat.

While the three men were gone, Smith and Cram worked at their assignments; Coville sat and drank beer. After half an hour's absence, defendant called out from the top of a levee that his group had returned. Four men walked single file down the trail to the camp. Williams was in the lead, followed in order by Madrigal, victim Burke, and defendant. When the four were about halfway down the trail, defendant suddenly grabbed Burke and pulled a knife. According to Smith, defendant moved around to the front of Burke and stabbed him; Cram saw defendant reach from behind to stab Burke in the chest. Burke protested, and a struggle ensued. Madrigal turned back to assist defendant. Burke began to make gurgling sounds.

Cram became hysterical, so defendant and Williams told Smith to take her to "Fag Beach" and wait.[2] Ten minutes later, defendant, Madrigal, Williams, and Coville arrived at the "Fag Beach" parking lot with the group's belongings. Defendant gave Coville a car key, which Coville used to unlock the trunk of a car parked in the lot. The group loaded their possessions in the car, proceeded to Interstate 5, and drove all night toward Southern California. Defendant indicated that they should eventually turn east, toward Missouri.

As they rode, Madrigal explained to Smith that "the man had died hard." Madrigal said Burke had managed to grab defendant's knife and inflict a thigh wound on defendant before Madrigal joined in to help defendant "finish the job and get his knife back." Madrigal indicated that he himself had been slashed across the stomach by Burke during the struggle. Smith said that, at one point, he saw defendant's and Madrigal's knives in the car.

About 3:30 p.m. the next day, as defendant was driving, an officer of the California Highway Patrol (CHP) stopped the group's car for speeding on Interstate 15 near Barstow. Investigation stemming from the traffic stop eventually led to the arrest of all six passengers, and to statements by Smith and Cram concerning the Burke homicide. (See discussion, *post.*) On September 8, Detective Burchett of the Sacramento Police Department took an in-custody statement from Cram which essentially conformed to her trial testimony.

Guided by Smith's directions, the police found Burke's body in its shallow riverbank grave on the morning of September 3. Burke's throat had been cut, and there were 24 other stab wounds, 8 in the rear of the body. The wounds could have been inflicted by more than one knife and more than one person. Burke's pants pocket was turned out, but his wallet had not been taken.

The car in which the group was arrested was registered to Ronnie Glover. Glover testified that on the evening of August 30, he loaned the car to his cousin Burke, with whom he was travelling. Burke then left the Shell station in the company of three men meeting the descriptions of defendant (glasses), Madrigal, and Williams (cowboy hat). Glover never saw Burke or the car again.

When examined at the time of booking, Madrigal and defendant both had fresh injuries. Defendant's wound was on the knee. A bloodstained knife was found in the car taken from Glover and Burke.

---

[2]"Fag Beach" is the name by which Smith referred to the riverbank area at the foot of North 10th Street, directly below the parking lot where Burke's auto had been left. The record discloses no official name for the beach. The informal name is used by the parties to this appeal, and we employ it, in quotation marks, for convenience only.

## 2. *Defense evidence.*

Defendant testified in his own behalf. He denied any plan to kill the victim and steal his car. The camp residents had engaged in a drunken discussion about killing people, but defendant insisted he merely taunted the others to show they were not as "tough" as they maintained. Defendant did tell the "sniveling" Cram that "[t]his will be your first day of school," but the remark was intended only to "shut her up." He did not order anyone to dig a grave or break camp before he went to meet Glover and Burke.

Later, according to defendant, Burke handed him the car keys when they arrived at the "Fag Beach" parking lot. Defendant was "fairly loaded" but not staggering drunk. As the four men walked from the car toward the camp, he and Burke were arguing over how to split the proceeds of drug sales and robberies planned for later in the evening. Burke wanted a larger share because he had furnished the car. Burke suddenly pulled a knife and slashed defendant on the leg. Defendant managed to get control of Burke's weapon and defended himself. Burke kept "charging" at defendant and Madrigal, forcing them to continue stabbing him. Burke could have left had he wished to do so.

Only after Burke's death, defendant said, did the group decide to take the car and flee. Attempts to dig a makeshift grave were unsuccessful, so they dragged Burke's body under a bush. They also threw knives belonging to defendant, Madrigal, Burke, and Smith into the river. Defendant denied going through Burke's pockets. He could not name the owner of the knife found in the car but said it was not Madrigal's.

William Gaida, a Sacramento detective, testified about a statement taken from Cram on September 2, which differed in minor respects from Cram's trial testimony. Larry Moser testified that several years earlier, he was seriously injured in a barroom fight initiated by Burke.

Coville testified in his own defense. He denied participating in or over-hearing a plan to kill Burke. Coville said he was drunk when defendant, Madrigal, and Williams returned to camp with Burke. Coville insisted he did not see the killing of Burke, but defendant later told him "this guy [had] jumped on [defendant] and stuck him with a knife" and defendant thought the "guy" was dead after a struggle. Coville recited in some detail how the group reached Burke's car and left town.

A psychiatrist, Dr. Globus, testified that Coville was an alcoholic with brain damage and a history of "amnestic episodes." Coville told Dr. Globus he remembered little of the incident besides drinking and "partying." Dr.

Globus believed Coville and concluded he could not have formed the mental states necessary for malice, premeditation, lying in wait, or intent to kill.

Neither Williams nor Madrigal testified. Madrigal's long history of behavioral and psychiatric problems and drug and alcohol abuse was detailed. Dr. Mungas, a psychologist, testified that Madrigal had hazy memories of a fight but remembered no details. Dr. Mertz, a psychiatrist, testified that Williams told her he had been consuming beer and amphetamines continuously by the evening of August 30; he remembered going to the Shell station and returning with Burke; he heard a scuffle behind him and took Cram away. Dr. Mertz concluded that because of drug and alcohol intoxication, Williams had diminished capacity to conspire, harbor malice, premeditate, or intend to kill.[3]

## PENALTY TRIAL

### 1. Prosecution evidence.

The People presented evidence that in the early morning of August 31, 1981, the day after the Burke homicide, defendant, Madrigal, Smith, and Williams robbed a convenience store in Pacoima. The prosecution presented a videotape of the robbery, along with the testimony of Smith and the store clerk, Eli Yitshaky. The evidence indicated that defendant was the ringleader, that he and Madrigal brandished knives, and that Yitshaky was knocked unconscious after complying with the robbers' order to lie down on the floor. The robbers took food, money from the cash register, and Yitshaky's personal property. Defendant, who followed Smith from the store, told Smith he had "punched [Yitshaky] out" and had taken his wallet and watch.

The prosecution introduced evidence that on October 31, 1981, defendant and Madrigal were convicted of armed robbery in the Pacoima case. Two Washington State felony convictions against defendant were also presented: a 1977 conviction for second degree assault, and a 1974 conviction for second degree burglary.

### 2. Defense evidence.

Several members of defendant's family testified in his behalf. According to his two sisters, the family was poor. Their father was unemployed and a

---

[3]The jury acquitted Coville and Williams of first degree murder, but found them guilty of robbery, second degree murder, grand theft of an auto, and conspiracy to commit robbery and first degree murder. Madrigal, like defendant, was found guilty of conspiracy, robbery, grand theft of an automobile, and first degree murder with personal use of a dangerous and deadly weapon. As to Madrigal, a lying-in-wait special circumstance was found not true, but a robbery-murder special circumstance was found true. Defendant and Madrigal proceeded to a separate penalty trial.

cruel alcoholic who often beat the children and their mother. Still, defendant was cooperative and hardworking until he returned from his two combat tours in Vietnam. Thereafter, his personality was completely changed; he was remote and bitter. He complained that television news about the war was inaccurate. While drinking in a bar with his sister Linda Moss, defendant cried and said he had run over a Vietnamese child while driving his Army supply truck during maneuvers. Defendant's mother confirmed her son's personality change after Vietnam and pleaded for his life.

Defendant produced documentary evidence that he had received the Bronze Star for combat bravery in Vietnam. The citation for this medal indicated that defendant, disregarding his own safety, had leveled "devastating" machine-gun fire on an advancing enemy force to protect tanks that were taking on ammunition from his supply truck.

Finally, defendant presented evidence about his efforts to learn a trade in the Washington State Penitentiary. A prison vocational counselor said defendant approached him for assistance in entering auto-body and welding courses. According to his instructors, defendant's performance in the auto-body class was average; his performance in a welding class was excellent.

Madrigal, who was jointly tried on the issue of penalty, also presented character and background evidence from relatives. Dr. Mertz expanded upon the guilt phase evidence of Madrigal's mental state. Dr. Mertz said Madrigal still had little recall of the Burke homicide and had expressed remorse. She reiterated that Madrigal was a chronic alcoholic and amphetamine abuser and diagnosed an "atypical pervasive developmental disorder" with antisocial features. These conditions, said Dr. Mertz, impaired Madrigal's capacity to appreciate the criminality of his conduct and to conform his behavior to law. The jury sentenced Madrigal to life imprisonment without parole.

 GUILT ISSUES[4]

1. *Search and seizure issues.*

Defendant claims his convictions must be reversed because the evidence linking him to Burke's death stems from illegal searches and seizures. (U.S. Const., Amends. IV, XIV; Cal. Const., art. I, § 13.) We disagree.

---

[4]At the outset, the People request that we take "judicial notice" of the Court of Appeal's *unpublished* decision in the joint appeal of codefendants Madrigal, Williams, and Coville. The People concede the decision has no res judicata or law-of-the-case effect on defendant's appeal. However, they suggest, the Court of Appeal's resolution of certain common appellate issues is deserving of "some consideration" by this court. The People's request circumvents the rule that, with exceptions not pertinent here, an unpublished opinion "shall not be cited or relied upon by a court or party in any other action or proceeding . . . ." (Cal. Rules of Court, rule 977(a), (b).) We therefore deny it.

The pertinent facts are gleaned from both the preliminary hearing and the superior court suppression hearing. On the afternoon of August 31, 1981, CHP Officer Abbott stopped a Chrysler automobile for speeding on Interstate 15 near Barstow. Abbott asked defendant, the driver, for his license; defendant produced only a birth certificate. While writing the speeding ticket, Abbott asked defendant who owned the car. Defendant said "it belonged to a guy in the back seat" but also indicated that the passengers were hitchhikers. Abbott then received a radio message that defendant was wanted on an outstanding warrant. Abbott arrested defendant, placed him in the patrol car, and radioed for assistance.

Backup units arrived within two or three minutes. Abbott then approached the Chrysler and asked the five passengers who owned it. All shrugged or shook their heads. Abbott ordered them out of the vehicle. Coville appeared intoxicated, so Abbott arrested him for public drunkenness and placed him in another patrol unit. Abbott asked again who owned the Chrysler and again received negative responses. Several of the occupants said they were hitchhikers. Abbott then searched the Chrysler's glove compartment and visor for registration papers. None were found. Abbott also radioed for a registration check on the vehicle, but he received no immediate reply.

While Abbott was looking inside the Chrysler for registration, he saw a wallet lying in the middle of the front seat, the position previously occupied by Coville. Abbott retrieved the wallet and asked each of the vehicle's occupants who owned it. Defendant explicitly denied ownership, as did all the others with the possible exception of the intoxicated Coville. Abbott then opened the wallet for the purpose of determining its owner. He found identification for Eli Yitshaky, the clerk of the Pacoima convenience store robbed by defendant and three of his companions early that morning.

Abbott eventually learned by radio that the Chrysler was registered to a Mr. Glover of Oroville, but the car had not been reported stolen. The passengers were asked if they knew Glover; all responded negatively. Smith, Cram, Madrigal, and Williams were released by the roadside with their belongings, and the car was impounded. Shortly thereafter, Abbott's investigation linked the wallet to the Pacoima robbery. Abbott learned that defendant and his five passengers fit the four robbers' general descriptions. The four released passengers were located and arrested. Smith and Cram made in-custody statements about the Burke homicide.

Detectives went to the impound lot on September 2. They had no search warrant. In plain sight, they saw beer cans, beer and cigarette cartons, meat

packages, and the like strewn about the interior of the Chrysler. These items matched articles taken in the Pacoima robbery. The detectives also saw a knife and letter opener on the rear shelf, and registration papers were observed on the sun visor.

Defendant claims Abbott's "search" of the Chrysler, leading to discovery of the wallet, was invalid because Abbott had neither a warrant, nor probable cause, nor justification based on exigent circumstances. Even if the wallet was properly discovered, he urges, Abbott had no right to open it and discover the incriminating information inside without first obtaining a warrant. Finally, defendant contends, the police lacked cause to impound the vehicle, thus providing detectives the opportunity to scrutinize it for evidence on September 2.

■ At the outset, we conclude Abbott acted properly when he removed the occupants of the Chrysler and entered the car for the limited purpose of finding the registration. Then, as now, the Vehicle Code allowed a CHP officer, among others, to inspect a registrable vehicle and its title in order to determine ownership. (Veh. Code, § 2805, subd. (a).)[5] The law also required the driver of a motor vehicle to produce his or her license and registration for examination upon a peace officer's demand. (*Id.*, §§ 4462, subd. (a), 12951, subd. (b).)[6] Within constitutional limits, such statutes authorize an officer to enter a stopped vehicle and conduct an immediate warrantless search for the required documents. (E.g., *People* v. *Faddler* (1982) 132 Cal.App.3d 607, 610-611 [183 Cal.Rptr. 328]; *People* v. *Burnett* (1980) 107 Cal.App.3d 795, 799-800 [165 Cal.Rptr. 781]; *Jackson* v. *Superior Court* (1977) 74 Cal.App.3d 361, 367 [142 Cal.Rptr. 299]; *People* v. *Martin* (1972) 23 Cal.App.3d 444, 447 [100 Cal.Rptr. 272]; cf. *Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790]; *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557 [128 Cal.Rptr. 641, 547 P.2d 417].)

The Chrysler was validly detained on the highway for a moving traffic violation. (Compare *Delaware* v. *Prouse* (1979) 440 U.S. 648, 663 [59 L.Ed.2d 660, 673-674, 99 S.Ct. 1391].) While that detention continued, Abbott learned that defendant was subject to arrest on an outstanding warrant. Defendant had disclaimed ownership of the car, stating that it

---

[5]Vehicle Code, section 2805, subdivision (a), provides in pertinent part: "For the purpose of locating stolen vehicles, a member of the California Highway Patrol [or a city or county officer conducting theft investigations] may inspect any [registrable] vehicle . . . and may inspect the title or registration of vehicles, in order to establish the rightful ownership or possession of the vehicle . . . ."

[6]Vehicle Code, section 4462, subdivision (a), provides: "The driver of a motor vehicle shall present the registration or identification card or other evidence of registration of any or all vehicles under his immediate control for examination upon demand of any peace officer."

Vehicle Code, section 12951, subdivision (b), provides: "The driver of a motor vehicle shall present his license for examination upon demand of a peace officer enforcing the provisions of this code."

belonged to a passenger, but also said the passengers were hitchhikers. The passengers confirmed they were hitchhikers, and all denied ownership. In this uncertain situation, Abbott was amply entitled to inspect the Chrysler's registration to ascertain its owner before deciding whether to release or impound the vehicle.

Moreover, it was reasonable for Abbott to remove the passengers and find the documentation himself. Abbott had every reason to believe that the occupants, who disclaimed ownership, would not be able to find or produce the registration on their own. (See *People* v. *Martin, supra,* 23 Cal.App.3d 444, 447; compare *Jackson* v. *Superior Court, supra,* 74 Cal.App.3d 361, 368.) For his own safety, Abbott was entitled to search for the papers personally and to remove the five passengers from the car before doing so. (See *People* v. *Faddler, supra,* 132 Cal.App.3d 607, 610; *Jackson, supra,* 74 Cal.App.3d at p. 369; *Martin, supra,* 23 Cal.App.3d at p. 447.) At the time he saw the wallet, Abbott was confining his search to the visor and glove compartment, traditional repositories of auto registrations. (See, e.g., *People* v. *Chavers* (1983) 33 Cal.3d 462, 470 [189 Cal.Rptr. 169, 658 P.2d 96].)

■ While engaged in these appropriate activities, Abbott saw the wallet lying in plain view in the now-empty interior. The observation and seizure of evidence in plain view from a position where the officer has a right to be is not constitutionally prohibited. (*People* v. *Rios* (1976) 16 Cal.3d 351, 357 [128 Cal.Rptr. 5, 546 P.2d 293]; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33].)

Abbott also acted constitutionally by opening the wallet to find out who owned it. Nobody at the scene claimed ownership or knowledge of the owner's identity. One passenger suggested the wallet might have been left behind by another person to whom the group had given a ride. Abbott had a duty of reasonable diligence to ascertain and notify the owner of apparently lost property he had found or received. (§ 485; see also Civ. Code, § 2080.1, subd. (b).) Abbott acted as a "caretaker" only; there is no indication his conduct was a pretext for seeking criminal evidence. The minimal scope of the intrusion conformed to his limited purpose.

Under these circumstances, Abbott's action, assuming it amounted to a "search," was constitutionally reasonable even absent a warrant or probable cause. (See *United States* v. *O'Bryant* (11th Cir. 1985) 775 F.2d 1528, 1534; *State* v. *Pidcock* (1988) 306 Ore. 335 [759 P.2d 1092, 1095], cert. den. (1989) 489 U.S. 1011 [103 L.Ed.2d 183, 109 S.Ct. 1120]; cf. *South Dakota* v. *Opperman* (1976) 428 U.S. 364 [49 L.Ed.2d 1000, 96 S.Ct. 3092] [inventory

search].)[7] For similar reasons, once Abbott determined that the identification in the wallet did not match any person on the scene, he was justified in seizing and retaining it for further investigation.

■ Nor can defendant seriously argue that it was unreasonable to impound the Chrysler. The car had been stopped on a desolate stretch of rural freeway, and a registration check disclosed it belonged to someone not on the scene. The driver and one of the passengers were under arrest. The remaining occupants disclaimed any link to the vehicle that would allow its release to them. Defendant's initial suggestion that he was driving with the permission of an owner-passenger had proven false. Thus, Abbott could not reasonably rely on defendant for instructions about securing the car.

In any event, probable cause had by then arisen to believe the Chrysler was stolen, and Abbott testified to such a suspicion. The impound was thus entirely proper. Evidence thereafter retrieved from the car without a warrant was observed in plain sight by officers at the impound lot. No illegal search and seizure occurred.

### 2. Motion to "fire" counsel.

On Friday, October 15, 1982, one day after the already-postponed guilt trial had been scheduled to begin in Judge Grossfeld's court, defendant moved before Judge Boskovich to "fire" his appointed trial attorney, Vincent O'Brien, for failure to "appeal [certain pretrial] motions." After inquiry, Judge Boskovich denied the motion. Defendant makes a number of arguments in connection with this incident. None has merit.

The context of defendant's contentions is as follows: The People proceeded by information, and search-and-seizure issues were litigated at the preliminary hearing. (§ 1538.5, subd. (f).) On March 2, 1982, defendant was arraigned in superior court. On April 30, 59 days later, defendant joined Madrigal's and Williams' motion to set aside the information under section 995. The section 995 motion urged (1) that the prosecution's evidence stemmed from an allegedly illegal search and seizure during the Barstow traffic stop, and (2) that there was insufficient evidence of lying in wait. After postponements, the section 995 motion was heard and denied on June 22.

On July 7, Madrigal and Williams sought a writ of prohibition to overturn the June 22 order. The petition, which defendant did not join, raised both the

---

[7]Indeed, by reporting the wallet stolen, its true owner, Yitshaky, had implicitly consented to police efforts to identify and recover it. (*People* v. *Hackett* (1981) 115 Cal.App.3d 592, 598 [171 Cal.Rptr. 320].)

search and seizure and lying-in-wait issues. It was summarily denied on August 26.[8]

Meanwhile, on July 14, defendant joined Madrigal's July 2 superior court motion to suppress evidence under section 1538.5, subdivision (i). The motion made search-and-seizure claims similar to those already rejected by the trial court under section 995. On September 28, after an evidentiary hearing, the trial court granted in part and denied in part the section 1538.5 motion. Defendant was precluded by statute from seeking pretrial review of this denial because the section 1538.5 motion had been filed more than 60 days after his arraignment. (§ 1510.)[9]

Trial was originally set for September 28, but the date had been continued to Thursday, October 14. The matter trailed thereafter pending completion of final pretrial motions. Judge Grossfeld, to whom the matter was assigned for trial, had constantly reminded the parties that trial should begin no later than Monday, October 18.

Judge Boskovich was also involved in the completion of pretrial motions. On Friday morning, October 15, with all defendants present, Madrigal moved before Judge Boskovich to relieve his appointed counsel, Robert Peters, and represent himself pursuant to *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].[10] Madrigal said he was dissatisfied because counsel had failed to "appeal" the denial of pretrial motions. Peters responded that writ relief had been sought from denial of the section 995 motion, and that counsel were "trying to prepare one on the denial of the 1538.5." The court declared that counsel's representation had been excellent, that the motion for self-representation was untimely, and that if it were granted, the ensuing trial delay would not be in the interest of justice. The court denied the *Faretta* motion and proceeded to other matters.

Later the same day, defendant interrupted the proceedings, stating that he wanted to "fire" O'Brien, his appointed counsel. Like Madrigal, defendant

---

[8]The pretrial writ proceedings in the Court of Appeal are not part of the record on appeal. Defendant has nonetheless asked us to take judicial notice of the Court of Appeal record. The People have been apprised of the materials to be judicially noticed and do not oppose the request. Accordingly, we grant it. (Evid. Code, §§ 452, subd. (d), 453, 459.)

[9]Section 1510 provides in pertinent part that "[t]he denial of a motion made pursuant to Section 995 or 1538.5 may be reviewed prior to trial only if the motion was made . . . not later than . . . 60 days following defendant's arraignment on the information or indictment if a felony, unless within these time limits the defendant was unaware of the issue or had no opportunity to raise the issue."

[10]The hearing on Madrigal's motion was not part of the original record on appeal in defendant's case. At the People's request, we augmented the record to include the transcript of this hearing.

declared that his dissatisfaction stemmed from counsel's failure to "appeal" pretrial motions. The court asked O'Brien for a response. O'Brien explained that a writ petition challenging the section 1538.5 denial "is to be filed on Monday" and that "the one for the [section] 995 [denial] has already been filed." Judge Boskovich indicated he would take the word of an officer of the court. A writ petition, said the judge, had "obviously" been filed "on these particular motions" and "I don't know what else [defendant] could ask for." Accordingly, "[t]he Marsden motion" to discharge counsel (see *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) was denied.

Coville immediately stated that he also wished to "fire" his appointed counsel for "conflict of interest" because pretrial motions had not been "appeal[ed]." Defendant interjected that "[w]e feel they're trying to get us into trial before we can get these motions into Appellate Court and get a ruling on them." Once again the court sought counsel's response. Coville's attorney, Lloyd Riley, explained that he intended to seek section 1538.5 review on behalf of Coville as soon as a transcript of the trial court proceedings became available. Riley "expected" the writ petition would be filed in the Court of Appeal by Wednesday, October 20, the day jury selection was scheduled to begin.

The court declared that all counsel had obviously done everything possible to present pretrial motions and writs, and that it appeared "we have reached the stage where . . . the defendants . . . are just trying to delay progress . . . ." Coville's motion was denied.

On Monday, October 18, all defendants jointly filed in the Court of Appeal a petition for writ of mandate challenging the trial court's partial denial of relief under section 1538.5. Citing section 1510, the Court of Appeal summarily denied the petition as untimely.

Defendant first argues that his counsel rendered constitutionally ineffective assistance by failing to join the only timely writ proceeding, that arising from denial of the section 995 motion, and for failing to file a section 1538.5 motion within 60 days after arraignment. Counsel's omission, he urges, effectively denied him pretrial appellate review of his lying-in-wait and search-and-seizure claims.

■ The appellate record fails to disclose the reasons for counsel's conduct. Even if we assume that counsel could have had no sound tactical purpose (see *People v. Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), defendant fails to show prejudice warranting reversal. Madrigal and Williams *did* seek writ review of the

section 995 denial; their petition properly raised the lying-in-wait and search-and-seizure issues common to all the defendants. The Court of Appeal summarily denied pretrial relief, and defendant fails to show that the result might have been different had he joined the petition.

In any event, by timely pursuing *trial court* remedies under sections 995 and 1538.5, counsel took all steps necessary to preserve defendant's claims for appellate review. The law permits an accused to seek pretrial writ review after motions under sections 995 and 1538.5 have been denied in the superior court (see §§ 999a, 1538.5, subd. (i)), but these procedures are optional. Counsel's failure to preserve defendant's pretrial writ rights did not preclude defendant from raising his lying-in-wait and search-and-seizure arguments on appeal from his convictions. Moreover, as we explain elsewhere (see discussions *ante* and *post*), those arguments fail on their merits.

Hence, any inadvertent mishandling of pretrial writs by Attorney O'Brien does not undermine confidence in the outcome of defendant's case. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052]; see *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) Nor was counsel's omission so serious as to cast doubt on the overall reliability of the adversarial process. (See *United States* v. *Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 668, 104 S.Ct. 2039].)

■ Defendant next argues that when he moved to discharge his attorney, counsel "misled" the trial court by implying inaccurately that defendant had joined the section 995 writ petition, and by failing to disclose that the anticipated section 1538.5 petition would be untimely. Defendant also suggests the court itself overlooked the statutory time limits applicable to the pretrial writs. As a result, he urges, the court ruled on his motion without realizing the legitimacy of his complaints.

■ When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 520 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Moore* (1988) 47 Cal.3d 63, 76 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People* v. *Marsden, supra,* 2 Cal.3d 118, 123-124.)

■ Here the court satisfied its duty to consider defendant's complaints. It allowed defendant to explain his single ground of dissatisfaction—

counsel's handling of pretrial writs. The court sought a response from counsel and considered the information provided in reaching a decision. There is no evidence that counsel intended to mislead the court. The court was entitled to accept counsel's explanation and was not obliged to inquire, sua sponte, into the actual efficacy of counsel's efforts.

Nor did the court err in denying the motion for substitution. Even if evidence of counsel's inadvertence had been before the court, defendant's showing indicates neither constitutionally inadequate assistance nor a fundamental breakdown of attorney-client relations. (See *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1163-1164 [259 Cal.Rptr. 701, 774 P.2d 730].)[11] Absent more convincing indicia that retention of Attorney O'Brien might "substantially impair" defendant's right to counsel, there was no obligation to appoint new counsel.

Defendant suggests the court might nonetheless have exercised its broad *Marsden* discretion differently had counsel's oversights been revealed. We are not persuaded.

Even under defendant's assumptions, counsel had committed no serious transgression. Having observed counsel's pretrial performance at some length, the court maintained that all defendants were receiving excellent representation. Three of the defendants suddenly presented similar motions to discharge their lawyers on the eve of an already-postponed trial. The court expressed its paramount concern, supported by the evidence, that these developments were an orchestrated last-minute attempt to delay trial. It does not appear reasonably probable that any gaps in the *Marsden* evidence affected the result of the motion. No basis for reversal appears.

■ Defendant claims he was also making a constitutional *Faretta* motion to represent himself. If his purpose was not immediately clear, he urges, the court had a sua sponte duty to inquire about his intent. However, there is no such duty. A defendant seeking to proceed in propria persona must make an *unequivocal* assertion of that right within a reasonable time before trial. (*People* v. *Wright* (1990) 52 Cal.3d 367, 409 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1219-1220 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187].) Defendant never hinted he wished to proceed without any lawyer, even though he was present when Madrigal earlier made just such a request. No *Faretta* error occurred.

---

[11]Defendant suggests a fundamental breakdown in attorney-client communications must be found to exist when counsel "misleads" the court in order to undermine his client's motion for substitution. As noted, however, the record contains no indication that O'Brien was engaged in an intentional effort to deceive.

### 3. *Absence of mental defenses.*

Defendant makes an appellate claim that O'Brien rendered ineffective assistance at the guilt phase by failing to investigate and present possible mental defenses, such as combat-induced posttraumatic stress disorder (PTSD). However, the record on appeal fails to disclose that counsel could or should have found and presented such evidence. As is appropriate in such circumstances (see *People* v. *Pope, supra,* 23 Cal.3d 412, 426), defendant has developed the claim more fully in his petition for habeas corpus. We therefore discuss it below in connection with the petition.

### 4. *Failure to request Keenan counsel.*

Defendant also asserts that O'Brien acted incompetently by failing to invoke the trial court's discretion to appoint a second attorney to assist him in the guilt phase of this capital case. (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108]; see now § 987, subd. (d).) Defendant cites the pretrial writ omissions, O'Brien's withdrawal for health reasons after the guilt phase, and the record statements of substitute penalty counsel William Owen that O'Brien had not properly prepared a penalty defense. These incidents, defendant urges, show that O'Brien failed to recognize he was inadequate to handle defendant's case on his own.

The record on appeal falls far short of a showing that counsel was constitutionally inadequate for failing to request cocounsel. As defendant concedes, O'Brien frequently consulted with Owen on an informal basis throughout the proceedings on guilt. Moreover, despite possible conflicts of interest among the codefendants, O'Brien had the support of codefendants' counsel on important common issues, such as search and seizure and the credibility of prosecution witnesses. The record discloses no evidence that O'Brien was overwhelmed in conducting the defense.

In any event, because the claim is presented as one of ineffective assistance of counsel, relief depends solely on whether counsel's error, if any, may have affected the outcome. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 692-693 [80 L.Ed.2d 674, 696-697]; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 584.) Defendant identifies no evidence in the record that such actual prejudice occurred, and we discern none. Hence, the claim must be rejected.

### 5. *Number of peremptory challenges.*

The trial court allowed 26 peremptory challenges to be exercised jointly by the 4 codefendants, and granted each codefendant 5 extra challenges to be

exercised individually, for a total of 46 peremptory challenges. The prosecution was also granted a total of 46 peremptory challenges.

The court allocated the challenges pursuant to former sections 1070 and 1070.5 (see now Code Civ. Proc., § 231, subd. (a)). Section 1070, subdivision (a), provided that defendant and the state were entitled to 26 peremptory challenges each in a case involving the death penalty or life imprisonment, and to 10 challenges each for all other but minor offenses.[12] Section 1070.5, subdivision (a), provided that when two or more persons were jointly tried for any but a minor offense, the number of challenges provided by section 1070 must be allocated and exercised jointly, with five additional challenges for each individual codefendant. In such cases, the People received challenges equal to the total number allowed the defense.[13]

Defendant now claims the statutes did not require joint exercise of the 26 defense challenges in a capital case, but rather granted each jointly tried capital defendant 26 separate challenges. He concedes his counsel expressly approved the trial court's allocation of challenges. However, he claims that once peremptories are granted by the state, the statutory allocation becomes a "fundamental" jury trial right that can only be waived by the accused personally. (See *People* v. *Holmes* (1960) 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583].)

■■■ We reject at the outset a right of personal waiver. Peremptory challenges are intended to promote a fair and impartial jury, but they are not a right of direct constitutional magnitude. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 88-89 [101 L.Ed.2d 80, 90, 108 S.Ct. 2273]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1005 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 281, fn. 28 [148 Cal.Rptr. 890, 583 P.2d 748].) In other contexts, we have assumed that the right to a full complement of peremptory challenges is less fundamental than the right to jury trial itself. For example, while improper denial of *any* jury is automatically reversible, improper denial of peremptory challenges warrants reversal only

---

[12]Former section 1070, subdivision (a), provided that "[i]f the offense be punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to 26 and the state to 26 peremptory challenges. Except [with respect to offenses punishable by imprisonment of 90 days or less], on a trial for any other offense, the defendant is entitled to 10 and the state to 10 peremptory challenges."

[13]Former section 1070.5, subdivision (a), declared that "[e]xcept [with respect to offenses punishable by imprisonment of 90 days or less], when two or more defendants are jointly tried for any public offense, whether felony or misdemeanor, the state and the defendants shall be entitled to the number of challenges prescribed by Section 1070 of this code, which challenges on the part of the defendants must be exercised jointly. Each defendant shall also be entitled to five additional challenges which may be exercised separately; the state shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants."

if the accused can show the error affected his right to a fair and impartial jury. (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087-1088 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 771 [251 Cal.Rptr. 83, 759 P.2d 1260].) We see no reason to deem the statutory privilege so "fundamental" or "critical" as to require personal waiver. (Cf. *People* v. *Guzman* (1988) 45 Cal.3d 915, 935-936 [248 Cal.Rptr. 467, 755 P.2d 917].)

We recognize that due process concerns may arise when the state arbitrarily withholds a nonconstitutional right provided by its laws. (*Ross* v. *Oklahoma, supra,* 487 U.S. at p. 89 [101 L.Ed.2d at pp. 90-91]; see *Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227].) However, California has never made personal waiver a part of the state-created right to peremptory challenges. Hence, defendant cannot claim his counsel's waiver violated his state-created due process rights. Because counsel agreed to the trial court's allocation of peremptory challenges, defendant's claim of improper allocation is barred on direct appeal. We dismiss it on that ground alone.

In addition, the claim fails on the merits. The allocation of challenges at defendant's trial was "supported by the plain language of the statute[s] and all relevant authority. [Citations.]" (*People* v. *Ainsworth, supra,* 45 Cal.3d 984, 1004.) ▪ Nor are a capital accused's constitutional rights offended by forcing him to share peremptory challenges with other capital and noncapital codefendants. (*Id.,* at pp. 1005-1007.)

6. *Sufficiency of robbery evidence.*

▪ Defendant claims the robbery evidence is insufficient, because there was no proof that property was taken from Burke's "person or immediate presence" against his will, and by means of force or fear. (§ 211.) If the robbery conviction is based on theft of the car key, defendant suggests, there is no evidence the key left Burke's "person or immediate presence" without his consent or by force. If Glover's auto was the property taken, defendant asserts, it also was not obtained from Burke's "immediate presence" by force; the vehicle was a significant distance from where Burke was assaulted, and it was appropriated only after his death.

Courts of Appeal have held that the "immediate presence" element is satisfied, even when the actual taking of property is far from the scene of the assault, "so long as [the victim] perceives any overt act in the commission of the robbery and is subjected to the requisite force or fear. . . ." (*People* v. *Martinez* (1984) 150 Cal.App.3d 579, 604 [198 Cal.Rptr. 565]; see also, e.g., *People* v. *Miramon* (1983) 140 Cal.App.3d 118, 124 [189 Cal.Rptr. 432];

*People* v. *Wiley* (1976) 57 Cal.App.3d 149, 160-161 [129 Cal.Rptr. 13]; *People* v. *Lavender* (1934) 137 Cal.App. 582, 589-590 [31 P.2d 439].) Under these cases, it would be enough that defendant and his companions killed Burke for the purpose of taking or retaining property entrusted to Burke's possession and control.

However, in *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376], we disapproved such an expansive interpretation of "immediate presence" for purposes of robbery. As we explained, to ignore the distance between the act of taking and the application of "force or fear" would deny meaning to the separate requirement of robbery that the property be "tak[en]" from the victim's person or "immediate presence." (*Id.*, at p. 628.)

█ Adopting the prevailing American rule, we held that " ' "[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation, or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it. [Citations.]" ' " (*Hayes, supra*, 52 Cal.3d at pp. 626-627, quoting *Commonwealth* v. *Homer* (1920) 235 Mass. 526 [127 N.E. 517, 520].) The zone of immediate presence includes the area "within which the victim could reasonably be expected to exercise some physical control over his property." (*Hayes, supra*, 52 Cal.3d at p. 627, quoting *People* v. *Bauer* (1966) 241 Cal.App.2d 632, 642 [50 Cal.Rptr. 687].)

█ The distance between Burke's auto and the murder scene was not so great as to violate these standards as a matter of law. Defendant, Madrigal, Williams, and Burke had brought the car from a remote location to the "Fag Beach" lot, which apparently was a common and convenient public parking spot for persons using the nearby riverbank. Burke and the three other men then walked the relatively short distance to the riverbank campsite—a mere quarter of a mile by defendant's own calculation. Like Burke, the robbers were on foot, and they were no closer to the car at the moment they assaulted Burke than was Burke himself. There was no evidence that Burke was too far away to perceive and resist an attempt to seize the vehicle.

The jury could thus reasonably infer that but for defendant's attack, Burke's relative proximity to the car would have allowed him to take *effective physical steps to retain control of the vehicle, and to prevent* defendant and his companions from stealing it. The jury could also conclude

that the theft was "by means of" force, in that defendant attacked Burke to eliminate his resistance to the taking.[14]

Moreover, nothing in *Hayes* suggests that criminals may escape robbery convictions simply by luring their victim far enough away from the property to make his control more difficult or the application of force or fear more convenient. *Hayes* disapproved several decisions holding that "immediate presence" is satisfied by the victim's perception of *any* overt act committed in aid of the taking, but our opinion expressly excepted a long-standing decision, *People* v. *Lavender, supra,* 137 Cal.App. 582. (*Hayes, supra,* 52 Cal.3d at p. 628, fn. 10.)

In *Lavender, supra,* 137 Cal.App. 582, robbers induced a hotel clerk to show them a room; once there, they tied up the clerk, extorted the combination to the office cash register, returned to the adjacent office, and rifled the register. The Court of Appeal reviewed decisions suggesting that "immediate presence" is satisfied if the victim is close enough to perceive the taking, but the court also observed that "[a]t least as early as the time when the clerk was induced to leave the hotel office . . . the crime of robbery was commenced; . . . *The trick or device by which the physical presence of the clerk was detached from the property under his protection and control* should not avail defendant in his claim that the property was not taken from the 'immediate presence' of the victim." (137 Cal.App. at p. 591, italics added.)

Similar principles have traditionally applied to the requirement that the taking be *both* from the victim's person or immediate presence *and* by force or fear. Cases untouched by *Hayes, supra,* 52 Cal.3d 577, hold that even if the perpetrator used peaceful means, such as a pretext, to separate the property from the victim, "what would have been a mere theft is transformed into robbery if the perpetrator . . . [later] uses force to retain or escape with [the property]." (*People* v. *Winkler* (1986) 178 Cal.App.3d 750, 756 [224 Cal.Rptr. 28]; see *People* v. *Anderson* (1966) 64 Cal.2d 633, 638 [51 Cal.Rptr. 238, 414 P.2d 366].)

We affirm these principles. One commits robbery when, with intent to rob, he uses peaceful means to move the victim away from a place where the victim could physically protect the property, then employs force or fear

---

[14]In *Hayes, supra,* the jury asked the meaning of "immediate presence" and was then specially instructed that a robbery occurs in the victim's "immediate presence" if he perceives any "overt act" connected with the offense. Because of this instructional error, we could not affirm robbery findings against Hayes simply by concluding that the evidence would have *supported* such findings under correct principles. (52 Cal.3d at pp. 627-629.) Here, by contrast, the jury received only the standard robbery instruction, CALJIC No. 9.10, which correctly set forth that the property must have been taken from the victim's "person or . . . immediate presence."

upon the victim in order to make good the theft or escape. The act of "taking" begins when the separation of the victim from his or her property occurs, and it continues through the forcible consummation. Hence, the defendant may be found guilty of a "taking" which is *both* from the victim's "person or immediate presence" *and* "by means of force or fear." (§ 211.) At oral argument, defendant's counsel conceded as much.[15]

 Here, the prosecution evidence indicated that defendant and his companions, acting by prearrangement, induced victim Burke to leave his car in the "Fag Beach" parking lot, then to walk with them to a more secluded place where their attack would be safer and his ability to protect the vehicle from seizure would be reduced. The jury could therefore conclude they robbed Burke of the car.

 Furthermore, the evidence supports a conclusion that the *key* to the car was taken from Burke's "person or immediate presence" by force or fear. Even under defendant's version of events, he obtained the key from Burke's "person"; defendant said Burke handed him the key at the "Fag Beach" parking lot. If the jury believed this, it could still conclude that defendant later used force to prevent Burke from retrieving the key. (See authorities cited *ante*.)

Finally, the jury could determine that defendant did use force in the first instance to gain possession of the key from Burke's "person." Burke's body was found with his pants pocket turned out, but his wallet was not missing. A reasonable inference arises that the key was obtained by killing Burke, then rifling his body. ██ ██ The evidence of robbery was suffi-cient.[16]

---

[15]*Hayes* itself included circumstantial evidence from which a trier of fact could infer that the defendant lured the victim, a motel manager, to a remote room on the pretext of a plumbing problem, then killed the manager to facilitate thefts from the motel office. (52 Cal.3d at pp. 597-599.) Our opinion did not mention this theory as support for our conclusion that the case for "immediate presence" was legally sufficient. (*Id.*, at pp. 630-631.) As noted, however, nothing in *Hayes* is inconsistent with a "luring away" theory of "immediate presence."

[16]Evidence that the *key* may have been taken from Burke's person or presence by force or fear does not spare us from deciding whether there was similar evidence with respect to the *car*. The instructions did not specify the object or objects of the robbery, nor was the jury required to do so in its verdicts and findings. In his closing argument, the prosecutor focused entirely on the plan to steal the car; he never mentioned the key or the evidence that it was taken from Burke's "immediate presence." Defense counsel exploited the omission. He accused the prosecutor of "glossing over" the object of the robbery, argued that the auto was not within Burke's "immediate presence," pointed to evidence that the key might simply have remained in the car, and disputed inferences that the key was taken from Burke's pocket after his death. Defense counsel also urged there was no robbery of the key if Burke handed it over voluntarily, as defendant testified. Under these circumstances, we cannot be certain the jury based its robbery findings on the premise that the key was taken separately from the car. Hence, we may not uphold the robbery findings unless we conclude there was substantial

### 7. *Theft as lesser included offense.*

■ Defendant claims all convictions and findings based on robbery must be reversed because the court failed to instruct sua sponte that if he formed the intent to steal only after Burke was killed, defendant was guilty at most of the lesser included offense of theft. The contention lacks merit.

■ Theft is a lesser included offense of robbery, which includes the additional element of force or fear. (*People* v. *Melton* (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741].) If intent to steal arose after the victim was assaulted, the robbery element of stealing by force or fear is absent. (*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613]; *People* v. *Green, supra,* 27 Cal.3d 1, 54.)

■ Defendant's testimony that he decided to take Glover's keys and car only after struggling with Burke is substantial evidence that he was guilty of theft, not robbery. ■ When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so. (*People* v. *Turner* (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706, 789 P.2d 887]; *Melton, supra,* 44 Cal.3d at p. 746; *Ramkeesoon, supra,* 39 Cal.3d at p. 351.)

■ Contrary to defendant's assertion, the court fulfilled its duty here. The jury received instructions correctly defining robbery *and* the lesser included offenses of attempted robbery, grand theft from the person, and grand and petty theft. Verdict forms were provided for each lesser offense. No more was required.

An accused is entitled *on request* to nonargumentative instructions that "pinpoint" the theory of the defense. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 870 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049].) However, defendant requested no "pinpoint" instructions on the issue of after-formed intent. The trial court had no sua sponte duty to provide them. (See generally *People* v. *Bloom, supra,* 48 Cal.3d 1194, 1212.)

Defendant suggests our *Turner* and *Ramkeesoon* decisions established a sua sponte duty to instruct on after-formed intent. Such is not the case. In *Turner* and *Ramkeesoon,* we addressed the presence or absence of

evidence to support *all* the robbery theories before the jury. (E.g., *People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].) For this reason, we must confront the issue of the auto's "immediate presence."

after-formed intent instructions only when deciding whether reversible *prejudice* had arisen from the trial courts' erroneous failure to furnish *any* instructions or verdict forms on lesser included offenses supported by the evidence. (*Turner, supra,* 50 Cal.3d at pp. 690-693; *Ramkeesoon, supra,* 39 Cal.3d at pp. 351-353.) In contrast to *Turner* and *Ramkeesoon,* the instant trial court did provide a full opportunity for conviction on lesser included offenses of robbery.[17] Defendant's assertion of direct error must therefore be rejected.

 Defendant's argument also fails as a claim that his counsel rendered ineffective assistance by omitting to request "pinpoint" instructions. The standard instructions made clear that robbery required a finding of taking by force or fear, while the lesser included theft offenses did not. The evidentiary dispute was between the prosecution's theory of a group-planned killing for robbery, on the one hand, and defendant's claims of theft as an afterthought to self-defense, on the other. Confronted with these two versions, and no other, the jury convicted defendant of conspiracy to rob and conspiracy to murder, based on instructions specifying overt acts that preceded Burke's death. It found defendant guilty of first degree murder "under the felony murder rule," i.e., homicide "as a result" of the actual or attempted commission of robbery with specific intent. It also found that defendant had committed first degree murder "other than under the felony murder rule," based on instructions defining premeditated murder and murder by lying in wait. It upheld a robbery-murder special circumstance under instructions that the robbery must not be "incidental" to the murder. (*People* v. *Green, supra,* 27 Cal.3d 1, 59-62.) And it further found as a special circumstance that defendant killed intentionally "while" lying in wait.

Hence, the jury necessarily and specifically rejected defendant's claim of after-formed intent. (See *Turner, supra,* 50 Cal.3d at pp. 691-693; *Melton, supra,* 44 Cal.3d at pp. 746-747; see also *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) Counsel's failure to request "pinpoint" instructions on the issue thus does not undermine confidence in the outcome. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 698]; see *People* v. *Fosselman, supra,* 33 Cal.3d 572, 584.)

---

[17]We have admonished that the jury should not be confronted with an "all or nothing" choice when it believes that the accused is guilty only of a lesser included offense. If given no opportunity to convict of the lesser offense, we reasoned, the jury may wrongly convict of the greater offense, even though it believes an element of that offense is missing, rather than acquit the defendant entirely. (See *Ramkeesoon, supra,* 39 Cal.3d at p. 352; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 324-325 [185 Cal.Rptr. 436, 650 P.2d 311].) That danger was eliminated here, since the jury was instructed to acquit or find a lesser included offense unless it believed beyond a reasonable doubt that all elements of robbery were present.

### 8. *Impeachment with prior burglary conviction.*

Defendant moved *in limine* to exclude three prior felonies for purposes of impeachment. The trial court excluded a 1977 assault and admitted a 1974 burglary. The court reserved judgment on whether the 1981 Pacoima robbery conviction could be used for impeachment and ordered the prosecution not to mention it until a final ruling was made. Defendant testified, and his own counsel elicited the 1974 burglary for defensive purposes. The prosecutor briefly cross-examined defendant about the burglary but did not refer to the 1981 robbery.[18]

 Defendant contends the trial court never exercised its discretion to exclude the 1974 burglary under Evidence Code section 352 because the court erroneously believed that prior felony convictions suggesting dishonesty must be admitted "without limitation" under a then-recent constitutional amendment added by Proposition 8. (Cal. Const., art. I, § 28, subd. (f) (hereafter article I, section 28(f)), added by initiative, Prop. 8, Primary Elec. (June 8, 1982), commonly known as the Victims' Bill of Rights.)[19] The claim lacks merit.

Because defendant's charged crimes occurred before the effective date of Proposition 8, the court was mistaken in its expressed belief that article I, section 28(f) applied. (See *People v. Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149].) However, the court also indicated it would exercise its discretion under pre-Proposition 8 authority to allow impeachment with the 1974 burglary. (E.g., *People v. Rist* (1976) 16 Cal.3d 211, 218-219 [127 Cal.Rptr. 457, 545 P.2d 833]; *People v. Beagle* (1972) 6 Cal.3d 441, 453-454 [99 Cal.Rptr. 313, 492 P.2d 1].) As the court noted, the burglary (which counsel conceded was theft related) bore on honesty, was dissimilar to the charged offenses, and was not unduly remote because defendant had not thereafter led a blameless life. (*Rist, supra*, 16 Cal.3d at pp. 218-222; *People v. Benton* (1979) 100 Cal.App.3d 92, 97 [161 Cal.Rptr. 12].) No error appears.

### 9. *Form of guilt verdicts.*

At the conclusion of the guilt trial, the court read its proposed instructions and verdict forms aloud to counsel, admonishing that "[i]f I don't hear any objection, the Court will interpret [counsel's] silence as we go through

---

[18]Defendant's claim that the prosecutor elicited the 1981 robbery during cross-examination is not borne out by the record.

[19]Article I, section 28(f) provides in pertinent part that "[a]ny prior felony conviction . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding. . . ."

these" to mean assent. With respect to count two (the murder charge), instructions on three theories of first degree murder were proffered: felony murder in the commission of robbery, deliberate and premeditated murder, and murder by means of lying in wait.

The court proposed that the jury be permitted to return any one or more of three separate verdicts of first degree murder against defendant. One specified that defendant was "guilty of . . . violation of section 187 . . . (MURDER IN THE FIRST DEGREE UNDER THE FELONY MURDER RULE)." A second stated that defendant was "guilty of . . . violation of section 187 . . . (MURDER IN THE FIRST DEGREE OTHER THAN UNDER THE FELONY MURDER RULE.)" A third declared that defendant was "guilty of . . . violation of section 187 . . . (MURDER IN THE FIRST DEGREE UNDER BOTH OF THE AFORESAID THEORIES: to wit, UNDER THE FELONY MURDER RULE AND OTHER THAN UNDER THE FELONY MURDER RULE.)"

Defense counsel voiced no objection, and the verdict forms described above were submitted to the jury as proposed. The court instructed that the jury must agree unanimously on each form. The jury signed all three. A jury poll confirmed the result. Counsel never objected to the murder verdicts in the trial court.

Defendant now asserts they were defective. As he notes, in a criminal case, "[t]he jury must render a general verdict," and may return a "special verdict" only "when they are in doubt as to the legal effect of the facts proved, . . ." (§ 1150.) "A general verdict upon a plea of not guilty is either 'guilty' or 'not guilty,' . . ." (§ 1151.) "A special verdict is that by which the jury find the facts only, leaving the judgment to the Court." (§ 1152.)

Defendant argues that a general verdict may not specify the theory of conviction, and a special verdict may not decide the ultimate issue of conviction or acquittal. Hence, he urges, the instant murder verdicts were neither general nor special, and were thus unauthorized.

However, the point was waived by defendant's persistent failure to object or seek corrective measures below. We reject it for that reason alone.

Furthermore, defendant cannot claim his counsel's failure to object constituted ineffective assistance warranting reversal. The forms returned by defendant's jury were not forbidden "special verdicts," but "general" verdicts supplemented by special "findings." (See *People v. Morales* (1989) 48 Cal.3d 527, 550 [257 Cal.Rptr. 64, 770 P.2d 244]; *People v. Burgener* (1986)

41 Cal.3d 505, 537-538 [224 Cal.Rptr. 112, 714 P.2d 1251].) We recently intimated that special "findings" may accompany a general criminal verdict, even if not expressly authorized by statute, so long as they do not interfere with the jury's deliberative process. (*People* v. *Farmer* (1989) 47 Cal.3d 888, 920 [254 Cal.Rptr. 508, 765 P.2d 940]; but see *People* v. *Perry* (1972) 7 Cal.3d 756, 783-784 [103 Cal.Rptr. 161, 499 P.2d 129].) Defendant identifies no deliberative harm that might arise from requiring the jury to agree on specific theories of first degree murder.

In any event, technical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. (§§ 1258, 1404;[20] see, e.g., *People* v. *Radil* (1977) 76 Cal.App.3d 702, 710 [142 Cal.Rptr. 233]; *People* v. *Bratis* (1977) 73 Cal.App.3d 751, 763-764 [141 Cal.Rptr. 45]; *People* v. *McKinney* (1945) 71 Cal.App.2d 5, 13-14 [161 P.2d 957].)

The instant verdicts conclusively show the jury's intent to convict defendant of first degree murder as charged in count 2. Defendant's claim of prejudice is less clear. He implies that the special findings denied him the benefit of a long-established principle of appellate review. This rule holds that "when the prosecution presents its case to the jury on alternate theories, some of which are legally [and factually supportable] and others legally [or factually defective], and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand. . . ." (*People* v. *Green, supra,* 27 Cal.3d 1, 69; see also *id.,* at pp. 70-71.)

But there is no "substantial right" to a verdict that is vulnerable in this respect. An accused suffers no cognizable "prejudice" when the trial court protects the record by directing the jury to agree unanimously on each alternate theory supporting the charge, and to disclose the results.

Even if defendant's theory were correct, no prejudice would arise on these facts. Every first degree murder theory presented and found against defendant was amply supported. (See discussions *ante* and *post.*) Hence, an undifferentiated verdict would not have changed the appellate outcome. No basis for reversal appears.

---

[20]Section 1258 provides that an appellate judgment shall be given "without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." Section 1404 provides that "[n]either a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right." (See also Cal. Const., art. VI, § 13.)

10. *Lying in wait.*

 Defendant contends the first degree murder conviction must be reversed insofar as it is based upon a theory of lying in wait, and that the lying-in-wait special-circumstance finding is also invalid, because there is no evidence he struck his victim from a place of hiding. He further claims the lying-in-wait special-circumstance finding is defective because the jury was not instructed (1) that an intentional killing was necessary and (2) that the killing must have occurred without "cognizable interruption" following the period of concealment and watchful waiting. All these arguments lack merit.

 The concealment required for lying in wait "is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim. [Citations.]" (*People* v. *Morales, supra,* 48 Cal.3d 527, 555, quoting *People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 406-407 [226 Cal.Rptr. 880].)

 Here substantial evidence indicated that the codefendants lured Burke to an isolated location on a pretext, and that defendant then watched and waited for an opportunity to ambush Burke from a position of advantage. That Burke was generally aware of defendant's presence does not negate the element of concealment. (*Morales, supra,* 48 Cal.3d at pp. 554-555; *People* v. *Ward* (1972) 27 Cal.App.3d 218, 230 [103 Cal.Rptr. 671].)[21]

 Nor was there instructional error on the issue of lying in wait. The trial court correctly instructed that murder by means of lying in wait requires only a wanton and reckless intent to inflict injury likely to cause death. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Atchley* (1959) 53 Cal.2d 160, 175, fn. 4 [346 P.2d 764]; see CALJIC No. 8.25.) On the other hand, the jury was told it could not find the special circumstance of murder while lying in wait unless the defendant "intentionally killed" the victim. (§ 190.2, subd. (a)(15); CALJIC No. 8.81.15.)

[21]Defendant suggests that by eliminating the requirement of physical concealment, *Morales* expanded liability in a way that cannot constitutionally be applied to crimes, such as his, that had already been committed. (See *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 352 [12 L.Ed.2d 894, 899, 84 S.Ct. 1697].) On the contrary, *Morales* represents no unforeseeable change in the law; our opinion cited numerous supportive California decisions dating back to 1947. (*Morales, supra,* 48 Cal.3d at pp. 554-555.)

The lying-in-wait instructions also expressed the correct temporal relationship between concealment and attack. For purposes of first degree murder, CALJIC No. 8.25, as received by the jury, states that the killing must be "immediately preceded" by the period of lying in wait. The special circumstance instruction set forth the statutory requirement that the murder was committed "while" the defendant was lying in wait. (§ 190.2, subd. (a)(15); CALJIC No. 8.81.15.) The evidence indicated that defendant maneuvered himself behind Burke, then attacked without warning from that position of advantage. (See *Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000, 1011 [181 Cal.Rptr. 486].) The jury cannot have been misled.

11. *Robbery-murder special circumstance.*

Defendant claims there was no substantial evidence, for purposes of the robbery-murder special circumstance, that the robbery was more than "incidental" to the murder. (*People* v. *Green, supra,* 27 Cal.3d 1, 59-62.) On the contrary, two prosecution witnesses testified at length to a plan of murder for the purpose of robbery. The record fully supports a robbery-murder special-circumstance finding.

12. *Miscellaneous contentions.*

Defendant makes two additional claims of error with respect to guilt and special circumstances. Both have been rejected in prior decisions. The contentions, and the dispositive contrary authority, are as follows:

■ "Death qualification" of the unitary guilt/penalty jury denied him a fair and representative guilt jury. (E.g., *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1165; *People* v. *Fields* (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680]; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].)

■ The jury should have been instructed that intent to kill is necessary for a robbery-murder special circumstance. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)[22]

---

[22]In any event, the jury necessarily found defendant intended to kill when it found true a special circumstance that defendant "intentionally killed . . . while lying in wait." (See *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721.)

PENALTY ISSUES

1. *Instructions on sympathy and mitigating evidence.*

 Defendant claims the trial court erred (1) by failing to countermand the standard "antisympathy" instruction given at the guilt trial and (2) by refusing defense instructions on character and background as "mitigating" evidence. No basis for reversal appears.

The trial court instructed in the statutory language that the jury could consider "[a]ny . . . circumstance which *extenuates* the gravity of the crime even though it is not a legal excuse for the crime . . . ." (§ 190.3, factor (k), italics added; CALJIC, former No. 8.84.1, factor (k).) At the defendants' request, the court added the phrase "including but not limited to the defendant's character, background, mental condition and physical condition." In his argument, the prosecutor minimized the importance of defense evidence in mitigation but never suggested that any evidence proffered by the defense was legally irrelevant. Hence, there is no reasonable likelihood the jury was misled about its constitutional and statutory duty to consider every "aspect of '[the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*People* v. *Easley* (1983) 34 Cal.3d 858, 878 & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813], quoting *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] [plur. opn.]; see *Boyde* v. *California* (1990) 494 U.S. 370, 381-382 [108 L.Ed.2d 316, 329-330, 110 S.Ct. 1190]; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1225 & fn. 23 [275 Cal.Rptr. 729, 800 P.2d 1159].)

Defendant claims the court should have substituted "mitigates" for "extenuates" as he suggested. However, the words are synonyms, and defendant fails to show how use of the statutory term "extenuates" obscured the jury's understanding. The court did not err by refusing the proffered substitution.

Defendant contends the court's failure to countermand the standard guilt phase "antisympathy" instruction (CALJIC No. 1.00) left the penalty jury insufficiently informed about its duty to " 'consider any "sympathy factor" raised by the evidence before it.' " (*People* v. *Easley, supra,* 34 Cal.3d at p. 876, quoting *People* v. *Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279].) On the contrary, the trial court gave a defense instruction that in weighing the "sympathetic elements" of the defendant's background, "the jury may consider pity, sympathy and mercy . . . ."

Defendant's assertion, that the prosecutor argued sympathy was irrelevant, lacks merit. The prosecutor maintained that the evidence in mitigation was

weak, and he invited the jury to accord defendant the same mercy defendant showed his victim. No suggestion was made, however, that consideration of sympathy would be legally improper. The jury cannot have been misled.

### 2. *Instructions on scope of sentencing authority.*

██ Defendant argues the court erred by instructing, in the language of the 1978 death penalty law, that the jury "shall" impose the death penalty if it determines that the aggravating circumstances "outweigh" those in mitigation. (§ 190.3; CALJIC, former No. 8.84.2.) These instructions, he claims, improperly suggested the death penalty is "mandatory" under certain circumstances.

We have concluded that the 1978 law's "shall/outweigh" language, properly construed, does not limit the sentencer's discretion to decide the appropriate penalty under the evidence. "Weighing" is neither a mechanical counting of factors nor an arbitrary assignment of values. It is the subjective mental process by which the sentencer "determines under the relevant evidence which penalty [it believes] is appropriate in the particular case. [Fn. omitted.]" (*People v. Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440]; see *People v. Boyde* (1988) 46 Cal.3d 212, 253 [250 Cal.Rptr. 83, 758 P.2d 25].)

In *Brown, supra,* we expressed concern that instructions phrased in the "unadorned" statutory language might sometimes be misleading. Therefore, we endorsed more elaborate explanatory instructions for use in subsequent trials. (40 Cal.3d at pp. 544, fn. 17, 545, fn. 19.) On the other hand, we examine pre-*Brown* trials in which the "unadorned" instruction was given to determine "whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*Id.,* at p. 544, fn. 17.)

Here, in addition to the "unadorned" standard instructions, the jury received a defense instruction that the mere counting of opposing factors was wrong, and that "[t]he particular weight of such opposing circumstances is not determined by the relative number, but by their relative convincing force on the ultimate question [of] punishment."

Furthermore, the prosecutor did nothing to exploit possible ambiguities in the "unadorned" instructions. His argument was brief and restrained. He simply claimed that aggravation outweighed mitigation, that mercy was not warranted, that defendant's culpability might be even greater than Madrigal's, but that both men deserved death. Under these circumstances, the jury

cannot have been misled about its discretion to impose the appropriate penalty under the particular circumstances. No basis for reversal appears.[23]

### 3. *Remorselessness as aggravating factor.*

■ Defendant also claims that by stressing defendant's mercilessness toward the murder and robbery victims, the prosecutor improperly urged absence of remorse as a "nonstatutory" aggravating factor. However, the prosecutor never stated that absence of remorse was aggravating.

Moreover, evidence that the murder of Burke and the robbery of Yitshaky were particularly remorseless could be considered in aggravation. Section 190.3, factor (a), "allows the sentencer to evaluate *all aggravating and mitigating aspects* of the capital crime itself. Moreover, there is nothing inherent in the issue of remorse which makes it mitigating only. The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation omitted.]" (*People v. Gonzalez, supra,* 51 Cal.3d 1179, 1232, italics in original, some italics omitted.) By similar reasoning, the prosecution may also show and argue in aggravation that other "violent criminal activity" by the defendant (§ 190.3, factor (b)) was particularly brutal, callous, and remorseless. (See *People v. Melton, supra,* 44 Cal.3d 713, 757.) No improper argument occurred.

### 4. *"Other crimes" instructions.*

The pertinent sentencing factors were submitted to the jury in the standard language of section 190.3 (see CALJIC, former No. 8.84.1), including factors (a) ("[t]he circumstances of the crime of which the defendant was convicted in the present proceeding . . . ."), (b) ("[t]he presence or absence of [violent] criminal activity by the defendant . . . ."), and (c) ("[t]he presence or absence of any prior felony conviction."). The court refused proffered defense instructions which would have specified that factors (a), (b), and (c) constitute mutually exclusive categories of crimes and do not overlap.[24] Defendant claims this was error.

■ Defendant is correct in his assertion that factors (a) and (b) are mutually exclusive. "[T]he term 'criminal activity [involving] force or

---

[23]Because we may reject defendant's claims under our traditional *Brown* analysis, we decline the People's request that we reconsider *Brown* in light of two recent United States Supreme Court decisions, *Blystone v. Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078] and *Boyde v. California, supra,* 494 U.S. 370. (*People v. Gonzalez, supra,* 51 Cal.3d 1179, 1231, fn. 30.)

[24]The proffered instruction would have added the phrase "other than those considered in (a) and (c)" to the end of factor (b), and the phrase "other than those considered in (a) and (b)" to the end of factor (c).

violence' as used in [factor] (b) is limited to conduct other than the immediate circumstances for which the death penalty is being contemplated. [Citation omitted.]" (*People* v. *Melton, supra,* 44 Cal.3d 713, 763; *People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Four years ago we stated that instructions in future cases should make clear the distinction between factors (a) and (b) "in order to avoid any possible confusion on this point." (*Miranda, supra,* 44 Cal.3d at p. 106, fn. 28.) However, we have not suggested that courts erred in earlier cases by refusing to elaborate upon the statutory language.

Indeed, we have stressed that any ambiguity in the earlier standard factor (a)-(b) instruction was unlikely to cause prejudice. Unless invited to do so by the prosecutor, we observed, "jurors are unlikely to give the circumstances of the current crime greater weight in the penalty determination simply because they appear to be included in two separate categories of statutory 'aggravation.' " (*People* v. *Melton, supra,* 44 Cal.3d at p. 763.) No such exploitation occurred here.

Furthermore, the court did not err by refusing instructions that distinguished factor (c) from both factors (a) and (b). The statutory language already separates factor (c) from factor (a) by limiting the jury's consideration to "prior" felony convictions. And, contrary to the import of the defense instruction, factors (b) and (c) *may* overlap; if defendant engaged in "violent criminal activity" which resulted in a "prior felony conviction," the jury may consider the violence under factor (b) and the conviction under factor (c). (*Melton, supra,* 44 Cal.3d 713, 764.)

5. *Admission of "subsequent" felony conviction.*

■ Defendant claims the trial court erred by admitting his conviction of the Pacoima robbery as aggravating evidence under section 190.3, factor (c). He notes our holding in *People* v. *Balderas* (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480], that while factor (b) of section 190.3 "imposes *no* time limitation" on the introduction of violent criminal *conduct* committed by the defendant, "the *'prior* felony *conviction[s]'* described in [factor] (c) . . . are limited to those entered *before commission* of the capital crime. . . ." (*Balderas, supra,* at p. 201, third italics in original.) As defendant suggests, his conviction of the Pacoima robbery, like the robbery itself, occurred after the capital robbery-murder was committed against Burke. The subsequent robbery conviction was therefore inadmissible under *Balderas* as an independent factor in aggravation. (See also *People* v. *Morales, supra,* 48 Cal.3d 527, 567.)

However, defendant failed to object or request limiting instructions when the conviction was introduced in evidence. Indeed, for obvious tactical reasons, the defense sought to *stipulate* to the convictions as a means of excluding the underlying facts. Hence, the issue is waived on appeal.

In any event, no basis for reversal appears. The Pacoima robbery conviction, based on defendant's guilty plea, *was* admissible under factor (*b*) as proof of his participation in the underlying violent criminal activity. (See, e.g., *People v. Hayes, supra,* 52 Cal.3d 577, 632-633 [juvenile adjudication for violent criminality]; *People v. Lucky* (1988) 45 Cal.3d 259, 294-295 [247 Cal.Rptr. 1, 753 P.2d 1052] [same].) Such proof was significant considering the victim's failure to identify defendant at the penalty trial.

Moreover, though the prosecutor also incorrectly argued the conviction's relevance under factor (c), and the jury received no contrary instruction, we see no prejudice. Once the brutal facts of the Pacoima robbery were disclosed, "[t]he additional fact that defendant was *convicted* of that offense could have added very little to the total picture considered by the jury . . . ." (*Morales, supra,* 48 Cal.3d at p. 567, italics in original.)

### 6. *Substitution of penalty counsel.*

 Defendant maintains he was entitled to a mistrial, or to a new penalty jury, when illness forced Attorney O'Brien to withdraw as his appointed counsel at the conclusion of the guilt phase. Defendant asserts that because substitute penalty counsel, William Owen, was not present at the guilt trial, Owen could not effectively reargue the credibility of guilt phase witnesses in order to establish "lingering doubt" as a factor in mitigation.

The only solution, defendant suggests, was to empanel a new penalty jury which would rehear the guilt phase evidence in Owen's presence. In defendant's view, the court had a sua sponte duty to order such remedies here. Alternatively, he suggests, counsel was ineffective for failing to request them.

Courts of Appeal have held that a fundamental deprivation of the right to effective representation may occur when circumstances force replacement of defense counsel for closing arguments only. The cases reason that substitute counsel has no means of raising credibility issues in counsel's summation, because counsel was not present to observe the witnesses' demeanor. A retrial may therefore be necessary, in which the evidence is presented to a new jury with substitute counsel present. (*People v. Manson* (1976) 61

Cal.App.3d 102, 197-203 [132 Cal.Rptr. 265]; see also *People* v. *Gibbs* (1986) 177 Cal.App.3d 763, 766 [223 Cal.Rptr. 194].)

A different situation arises, however, when substitution becomes necessary between the guilt and penalty phases of a capital trial. The jury has already heard the credibility arguments of guilt phase counsel who *was* present for testimony, and has nonetheless convicted the defendant of capital murder.

The separate penalty phase assumes the validity of the capital conviction, then addresses a different issue—which available punishment is appropriate under all the aggravating and mitigating circumstances. "Lingering doubt" arguments are often unwise, for they risk antagonizing a jury that has already found the defendant guilty.[25]

The theoretical possibility of a lingering-doubt argument does not automatically require the heroic and cumbersome procedure defendant suggests. The trial court in this case had no sua sponte duty to empanel a new penalty jury simply because guilt counsel was forced to withdraw before the penalty phase commenced.

Nor does counsel's failure to press the issue warrant reversal on a theory of ineffective assistance. Though Attorney O'Brien and his guilt phase colleagues argued credibility issues with vigor, the jury had clearly rejected them and had accepted every prosecution theory of defendant's role and guilt.[26] The eyewitness and circumstantial evidence supporting their verdicts was very strong indeed. Moreover, a contemporaneous example of defendant's violent criminal leadership was presented at the penalty phase.

■

Under these circumstances, the penalty jury was unlikely to give lingering doubt substantial weight on the issue of penalty. Any hindrance of penalty counsel's ability to present a lingering-doubt argument does not undermine confidence in the outcome.

### 7. *Miscellaneous contentions.*

Defendant makes two other arguments on the issue of penalty which have been thoroughly considered and rejected in prior cases. The contentions, and the dispositive contrary authority, are as follows:

---

[25]The guilt and penalty trials must be before the same jury, except upon a showing of good cause. The guilt phase evidence may be considered at the penalty phase. (§ 190.4, subds. (c), (d); see, e.g., *People* v. *Beardslee* (1991) 53 Cal.3d 68, 101-102 [279 Cal.Rptr. 276, 806 P.2d 1311].)

[26]Here, the prosecution's case on guilt withstood the attacks of *four* separate defense counsel upon the credibility of prosecution witnesses Smith and Cram.

■ "Triple-counting" the same facts (murder in the commission of robbery) as first degree murder, a death-qualifying special circumstance, and an aggravating factor at the penalty phase, violates guaranties against cruel and unusual punishment, double jeopardy, and multiple punishment. (*People v. Marshall* (1990) 50 Cal.3d 907, 945-946 [269 Cal.Rptr. 269, 790 P.2d 676]; *People v. Balderas, supra,* 41 Cal.3d 144, 199-200; see *Lowenfield v. Phelps* (1988) 484 U.S. 231, 241-246 [98 L.Ed.2d 568, 579-583, 108 S.Ct. 546].)

■ The death penalty may be imposed only for a deliberate and premeditated murder which also includes a special circumstance. (*Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 716, 107 S.Ct. 1676]; *Cabana v. Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689]; *People v. Anderson, supra,* 43 Cal.3d 1104, 1138-1148.)

## HABEAS CORPUS

■ Defendant has submitted a petition for habeas corpus alleging ineffective trial assistance and newly discovered evidence. Defendant claims that the failure of guilt phase counsel, Vincent O'Brien, to investigate a defense based on drug and alcohol intoxication and combat-induced PTSD was prejudicial at both the guilt and penalty phases. Defendant further asserts that O'Brien's failure to seek live witnesses to defendant's heroism in Vietnam hindered substitute penalty phase counsel and caused the omission of important evidence in mitigation of penalty. At the least, defendant asserts, he has discovered "new" evidence on these topics that justifies a new trial. In our view, defendant fails to state a prima facie case for relief.

In support of the PTSD claim, defendant attaches the declaration of Dr. John W. Podboy, a licensed clinical psychologist with substantial experience as an expert witness for both sides in criminal trials. After conducting two posttrial examinations of defendant, a review of his military records, and interviews with members of his family, Dr. Podboy concludes that defendant "suffered from a psychological condition at the time of the homicide, produced by a combination of drug abuse, alcohol abuse, and posttraumatic stress from his military service" which, if presented at trial, "could" have altered the guilt and penalty verdicts.

We note at the outset that defendant's claims of an inadequate pretrial mental investigation are vigorously denied by trial counsel O'Brien. Defendant declares that O'Brien had him examined only for sanity and competence, but O'Brien's declaration *attached to the petition* states otherwise. O'Brien insists he was aware of PTSD, had defendant examined for this specific purpose, and obtained no encouraging opinions. The People have supplied a

further declaration from O'Brien, who confirms he pursued a PTSD defense but was told by both of his chosen experts, Drs. Budwin and French, that there was "no evidence" of PTSD or any other mental state affecting criminal intent. Of course, counsel is not required to pursue repetitive mental examinations until he finally obtains a favorable diagnosis. (*People* v. *Williams* (1988) 44 Cal.3d 883, 945 [245 Cal.Rptr. 336, 751 P.2d 395].)

O'Brien's declaration implies that his pretrial mental experts did not have defendant's military records available; according to O'Brien, the defense investigator had not completed work in that area by the time of O'Brien's withdrawal at the conclusion of the guilt phase. Moreover, substitute penalty counsel, William Owen, disputes O'Brien's claim that O'Brien had done any substantial work in preparation for the penalty phase.

However, Owen himself ultimately had the benefit of a five-week hiatus between the guilt and penalty trials. Early in this hiatus, during an in camera continuance hearing, Owen represented to the trial court that he had already sent his own chosen psychologist to reexamine defendant, and had also requested defendant's military records, which he expected to receive quite promptly. Despite these steps, Owen did not proffer a mental-state defense at the penalty phase and did not develop defendant's military background beyond presenting the Bronze Star citation.

In his declaration attached to the petition, Owen concedes the hiatus between trials, and he acknowledges he received "some" court-ordered funds for penalty phase investigation. Nonetheless, Owen fails to mention the outcome of his inquiries. We find the omission significant. The inference arises that Owen was privy to full information but found nothing further of benefit to defendant's case.

There is, however, a more fundamental reason why defendant's petition must fail. It appears clear that omission from defendant's trial of the information he now presents does not undermine confidence in either the guilt or penalty verdicts.

At the guilt trial, the prosecution presented evidence of a careful plan to commit murder for robbery; defendant claimed self-defense. Defendant concedes that the number and nature of Burke's wounds, and his own trial admission that he gained possession of the only weapon early in the struggle, doomed any claim of "reasonable" self-defense. However, defendant suggests, information about PTSD would have supported a theory that he reflexively overreacted to Burke's initial attack as a result of combat training and stress. The jury's acceptance of such an "honest but unreasonable"

self-defense theory, he points out, would at least have reduced the homicide to voluntary manslaughter. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1].)

However, the evidence for the prosecution's theory, which negates *any* claim of honest self-defense, was extremely convincing. Two eyewitnesses testified to a plan to ambush, rob, and kill Burke, and their accounts coincided in all essential details. The previous night's robbery provided a strong motive; the pattern of wounds on Burke's body suggested a surprise attack; and the group's flight indicated consciousness of guilt.

Moreover, one of the principal prosecution witnesses, Bruce Smith, implicated *himself* in the murder-robbery conspiracy and revealed on the stand that *he* had pled guilty to murder for his part in the killing. Under these circumstances, PTSD evidence had little chance of bolstering defendant's version of events—a version that exonerated Smith.

Nor, in our view, would the outcome have been altered by further development of a theory that drug and alcohol consumption, and PTSD, had diminished defendant's capacity to intend a robbery or a killing. The guilt jury was aware that defendant and his companions had consumed drugs and alcohol in substantial amounts on the day of Burke's murder. However, the eyewitnesses suggested defendant was not highly intoxicated. Defendant agreed.

Moreover, defendant's own testimony suggested he was pursuing a rational plan to use Glover's car for robberies and drug sales. His extensive recall of the events of August 30 also weighs heavily against a finding of diminished capacity. It is not reasonably probable that pursuit of a diminished capacity defense would have affected the guilt verdict.

We also conclude that the absence of evidence on PTSD, and on defendant's combat experiences, does not undermine confidence in the penalty judgment. The jury believed beyond reasonable doubt that defendant had personally participated in a brutal robbery-murder, and it obviously accepted the prosecution's claim that he was the leader of the plot.[27] The jury heard that defendant had sustained other serious felony convictions, and committed other acts of criminal violence, over an extended period.

On the other hand, the jurors knew of defendant's valorous performance qualifying him for the Bronze Star, and they had access to the official

---

[27]Defendants Williams and Coville had been convicted of noncapital charges. Though the jury convicted Madrigal of capital murder, it found true a lying-in-wait special circumstance only with respect to defendant. Madrigal received a sentence of life without parole, and only defendant was sentenced to death.

description of his heroism on that occasion. Counsel was not obliged to locate and present live witnesses to these events.

The jurors also heard from several members of defendant's family that his experiences in Southeast Asia had deeply changed his personality, and that he was "messed up" on drugs when he returned. Defendant's sister described his remorse for accidentally running over a Vietnamese child during military maneuvers. The jury thus received a substantially accurate picture of the mitigating aspects of defendant's character and background.

Defendant claims that professional analysis of defendant's Army records would have disclosed a classic case of combat-related psychological deterioration. Though his service record was excellent until his return from Vietnam, defendant suggests, his subsequent drug abuse, poor attitude, and absences without leave led to numerous punishments and demotions, and finally to discharge on grounds of unfitness.

However, placing these records in issue would have posed dangers that largely eliminated their value. The service documents attached to the petition reveal, for example, that defendant was punished for unauthorized leave from his combat unit in mid-November 1969, less than two weeks *before* his Bronze Star heroism.

Moreover, the Army psychological profile prepared just prior to defendant's separation from service in 1970 concluded that there were "no mental defects" warranting a medical discharge, and that defendant "was and is mentally responsible, [and] able to distinguish right from wrong and adhere to the right . . . ." The profile described defendant in unflattering terms as a "habitual drug user" who "disagrees with what the Army stands for," "feels no responsibility toward the Army and does whatever he feels like doing," and "lack[s] any motivation to do a job well." Defendant was deemed unamenable to counseling.

Cross-examination of defense experts on these points could hardly have helped defendant's case. The defense avoided these traps by presenting the Bronze Star citation alone, then allowing family members to describe defendant's worsening mental condition.

Under these circumstances, neither Dr. Podboy's analysis, nor the failure to develop defendant's military background, casts substantial doubt upon the guilt and penalty verdicts. Hence, we conclude that defendant has failed to state facts entitling him to relief on habeas corpus. (*Strickland* v. *Washington, supra*, 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698]; *People* v. *Fosselman,*

*supra*, 33 Cal.3d 572, 584; see *In re Swain* (1949) 34 Cal.2d 300, 304 [209 P.2d 793].)

DISPOSITION

The guilt and penalty judgments are affirmed. The petition for habeas corpus is denied.

Lucas, C. J., Panelli, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment as to defendant's conviction of first degree murder, conspiracy to commit first degree murder, and grand theft of an automobile (together with the various sentence-enhancement findings). I also concur in the denial of the petition for writ of habeas corpus.

Otherwise, I dissent.

To begin with, I would reverse defendant's conviction of robbery. The evidence is insufficient on at least one of the theories presented to the jury, specifically, that relating to the taking of the automobile.

Robbery has been defined by the Legislature as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.)

It is indisputable that the automobile was *not* taken from the victim's "immediate presence"—so long as that crucial phrase is given a reasonable construction, as it was in our recent decision in *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376]: "[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." (*Id.* at pp. 626-627, internal quotation marks omitted.) The automobile here was *at least a quarter of a mile* from the victim.

The majority's analysis expands the crime of robbery in an altogether novel fashion and beyond any reasonable limit marked by the Legislature's definition. Not only does the offense cover—as it has always and properly covered—the "taking" of an item of personal property from a person's "immediate presence" "by means of force or fear." But today for the first time, it is extended to the "taking" of the person from the item's "immediate

presence" by any means whatever—including, as here, deceit totally devoid of force or fear. The legislative definition has been redefined.

The majority's analysis also overrules *Hayes* sub silentio. As noted, the rule of that case is that an item of personal property is in a person's "immediate presence" if it "is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." (52 Cal.3d at p. 627, internal quotation marks omitted.) The majority effectively "restate" the rule to the following effect: the item is in the person's "immediate presence" if it "is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, *regain* his possession of it." As so "restated," the rule disappears. This is because a person, if not for violence or fear, can conceivably regain possession of any item, no matter how far distant it is.

As shown above, the evidence is insufficient to support the robbery conviction on at least one of the theories presented to the jury. When such is the case, the conviction must be reversed. (*People* v. *Green* (1980) 27 Cal.3d 1, 69-71 [164 Cal.Rptr. 1, 609 P.2d 468].)

I would then set aside the felony-murder-robbery special-circumstance finding. The underlying special circumstance, of course, requires a robbery. (Pen. Code, § 190.2, subd. (a)(17)(i).) But as shown, the evidence of robbery is insufficient. It follows that the evidence of the special circumstance is insufficient as well.

Next, I would set aside the lying-in-wait special-circumstance finding.

This finding is factually unsupported. As I explained in my concurring and dissenting opinion in *People* v. *Morales* (1989) 48 Cal.3d 527, 574 [257 Cal.Rptr. 64, 770 P.2d 244], the lying-in-wait special circumstance requires waiting, watching, and concealment. "Concealment" means actual physical concealment of the killer's person, and not merely—as a majority of this court inexplicably held in *Morales* at page 555—mere concealment of his true intent and purpose. "[T]he gist of 'lying in wait' is that the person places himself in a position where he is waiting and watching *and concealed from the person killed* with the intention of inflicting bodily injury upon such person or of killing such person." (*People* v. *Morales, supra,* at p. 574, internal quotation marks omitted, italics in original (conc. & dis. opn. of Mosk, J.).) The evidence here establishes without dispute that there was *no* actual physical concealment of defendant's person from the victim.

The lying-in-wait special-circumstance finding is legally unsupported as well. The underlying special circumstance, as defined by the holding of the

majority in *Morales* and by the instructions of the trial court here, requires concealment of only the killer's true intent and purpose. So defined, it is inadequate as a predicate for the determination of death eligibility under the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution—and, a fortiori, under the cruel or unusual punishment clause of article I, section 17, of the California Constitution.

As I also explained in my concurring and dissenting opinion in *Morales* —without substantive response on the part of the majority therein: "To withstand scrutiny under the Eighth Amendment as a valid predicate for the determination of death-eligibility, a special circumstance ' ". . . must . . . provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " ' [Citations.] Whether the basis for distinguishing between cases is 'meaningful' depends on whether it serves the principal social goals of the death penalty: retribution and deterrence. [Citation.]

"In my view, the lying-in-wait special circumstance does not pass constitutional muster. My reasons are as follows. First, this special circumstance does not distinguish the few cases in which the death penalty is imposed from the many in which it is not. Indeed, it is so broad in scope as to embrace virtually all intentional killings. Almost always the perpetrator waits, watches, and conceals his true purpose and intent before attacking his victim; almost never does he happen on his victim and immediately mount his attack with a declaration of his bloody aim. Second, the lying-in-wait special circumstance does not provide a meaningful basis for distinguishing between murderers who may be subjected to the death penalty and those who may not. To my mind, the killer who waits, watches, and conceals is no more worthy of blame or sensitive to deterrence than the killer who attacks immediately and openly." (*People* v. *Morales*, *supra*, 48 Cal.3d at p. 575 (conc. & dis. opn. of Mosk, J.).)

Because the lying-in-wait special circumstance, as defined to require concealment of only the killer's true intent and purpose, is inadequate as a predicate for death eligibility under the cruel and unusual punishments clauses, the related finding in this case is constitutionally invalid.

Finally, I would reverse the sentence of death. When the felony-murder-robbery and lying-in-wait special-circumstance findings are set aside, there remains no valid special-circumstance finding. Without such a finding, as relevant here, a defendant is not eligible for the ultimate sanction. (See Pen. Code, § 190.2, subd. (a).) As a result, the sentence of death in this case is

unsupported as a matter of law. (E.g., *People* v. *Guerra* (1985) 40 Cal.3d 377, 389 [220 Cal.Rptr. 374, 708 P.2d 1252].)[1]

For the reasons stated above, I would reverse defendant's conviction of robbery, set aside the felony-murder-robbery and lying-in-wait special-circumstance findings, and reverse the sentence of death.

**BROUSSARD, J.,** Concurring and Dissenting.—I join in the concurring and dissenting opinion of Justice Mosk. As he and Justice Kennard point out, defendant's conviction for robbery and the special circumstance of felony murder based upon robbery cannot stand, because the victim's car—the object of the robbery—was not taken from the person or immediate presence of the victim. I agree also with Justice Mosk that the special circumstance of murder while lying in wait should be set aside, but write separately to explain more fully my views on this subject.

First, I doubt whether the evidence supports a special circumstance of lying in wait in the present case. In *People* v. *Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244], the leading decision defining that special circumstance, the court held that physical concealment is not required—only concealment of purpose—but emphasized that such concealment must be accompanied by "a substantial period of watching and waiting for an opportune time to act." (P. 557.) The court distinguished *Richards* v. *Superior Court* (1983) 146 Cal.App.3d 306 [194 Cal.Rptr. 120], a case in which, according to *Morales*, "the victim was stabbed to death and robbed after

---

[1] In passing, I note the following. The majority make the statement, which purports to derive ultimately from *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], that "Denial of the motion [for substitution of appointed counsel] is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." (Maj. opn., *ante*, at p. 435.)

A review of *Marsden* and other applicable authorities teaches that the quoted statement should not be read literally. Otherwise, it would "immunize" each and every denial of a substitution motion that does not " 'substantially impair' the defendant's right to assistance of counsel"—no matter how unreasonable any such denial might in fact be.

In *Marsden* we held: "[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney . . . is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney. 'A defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. . . .' " (2 Cal.3d at p. 123.)

The *Marsden* holding entails the following proposition—which I have cast in the majority's terms: when the defendant shows that a failure to replace his appointed attorney would "substantially impair" his right to the assistance of counsel, the trial court *must* replace the attorney; otherwise, it may replace the attorney or not depending on the totality of the relevant circumstances.

being lured to a garage by the defendants on the pretext that they needed to recover some of their tools." (48 Cal.3d at p. 556.) *Morales* disapproved *Richards*'s reasoning to the extent that *Richards* required physical concealment, but approved *Richards*'s result, on the ground that in *Richards* there was an absence of "*any* period of watchful waiting on the defendant's part. They simply lured their victim to a garage and killed him." (*Ibid.*)

The facts of the present case closely parallel *Richards*. In that case the defendants persuaded the victim to go with them to a garage where they intended to kill him. When he arrived they killed him as planned. Here the defendants persuaded the victim to come with them to their riverside camp where they intended to kill him. When he arrived they carried out their plan. I see no factual distinction. If *Richards* was rightly decided (as *Morales* implied) on the ground that there was no period of watchful waiting, we should reach the same conclusion here.

If we assume for sake of argument that the present case is one of murder while lying in wait as that concept is defined in *Morales*, we reach the question whether that concept provides a constitutionally adequate basis for deciding which murderers are subject to the death penalty. As I will explain, lying in wait originally served an entirely different purpose—to classify as first degree murder those killings committed by means which conclusively demonstrated premeditation. It was not intended to and does not serve to distinguish among premeditated first degree murders so as to single out those particularly heinous killings which may warrant death.

The concept of murder by lying in wait entered California law in 1856. (Stats. 1856, ch. 139, § 2, p. 219.) Its function was explained in *People* v. *Sanchez* (1864) 24 Cal. 17: "In dividing murder into two degrees, the Legislature intended . . . to establish a test by which the degree of every case of murder may be readily ascertained. That test may be thus stated: Is the killing wilful, (that is to say, intentional,) deliberate, and premeditated? If it is, the case falls within the first, and if not, within the second degree. There are certain kinds of murder which carry with them conclusive evidence of premeditation. These the Legislature has enumerated in the statute . . . . These cases are of two classes. First—Where the killing is perpetrated by . . . means of poison, lying in wait, or torture. . . ." (Pp. 28-29.) In short, the prosecution could either prove premeditation directly, or it could prove it indirectly by proving poison, lying in wait, or torture, since it was inconceivable that a defendant who used such means would not have premeditated.

Current Penal Code section 189, enacted in 1872, codified the reasoning of *Sanchez*. It provides that "[a]ll murder which is perpetrated by means of

. . . lying in wait, or by any other kind of wilful, deliberate, and premeditated killing . . . is murder of the first degree." The reference to "any *other* kind of wilful, deliberate, and premeditated killing" (italics added) makes it clear that murder by lying in wait is considered to be simply one kind of premeditated murder.

The California courts construed the concept of lying in wait as providing an alternative method for showing premeditation. Thus in *People v. Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1], Justice Traynor noted that "[t]here must . . . be substantial evidence of a long enough period of waiting and watching in concealment to show a state of mind equivalent to premeditation and deliberation before the court can properly give an instruction on lying in wait." (*Id.* at p. 481 (conc. opn.); see *People v. Hyde* (1985) 166 Cal.App.3d 463, 475 [212 Cal.Rptr. 440].)

Consequently the courts did not require physical concealment for lying in wait, for proof of physical concealment is not necessary to show premeditation. Proof that a defendant waited for the opportunity to kill the victim, concealing his purpose (*People v. Tuthill* (1947) 31 Cal.2d 92, 100-101 [187 P.2d 16]) or his identity (*People v. Hyde, supra,* 166 Cal.App.3d 463, 475-476) is sufficient to show premeditation.

The 1978 death penalty initiative, however, added many special circumstances to Penal Code section 190.2, including one under which a defendant must be sentenced to death or life imprisonment without possibility of parole if the "defendant intentionally killed the victim while lying in wait." (Pen. Code, § 190.2, subd. (a)(15).) In this setting, lying in wait is not a means of proving premeditation in order to show the murder is one of the first degree. To the contrary, the murder must already have been found to be first degree before the jury reaches the question of special circumstance.

Instead, the special circumstance of lying in wait serves—and to be constitutional, must serve—a different purpose: it must provide a " ' "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." ' " (*Godfrey v. Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759], quoting *Furman v. Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (White, J., conc.); see *McCleskey v. Kemp* (1987) 481 U.S. 279, 305-306 [95 L.Ed.2d 262, 287, 107 S.Ct. 1756] (state must establish rational criteria for death eligibility).) Past cases which define lying in wait by looking to actions which demonstrate premeditation are of no help in this setting. Instead, we must define murder by lying in wait so there is a qualitative moral difference between such murders and those which do not involve lying in wait—one of such significance that a person who kills by

lying in wait should be executed, or at least imprisoned for life without possibility of parole, while one who kills without lying in wait (or any other special circumstance) deserves at most life imprisonment with possibility of parole.

Recognizing this constitutional imperative, the court in *People* v. *Morales*, *supra*, 48 Cal.3d 527, 557, said, "we believe that an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, presents a factual matrix sufficiently distinct from 'ordinary' premeditated murder to justify treating it as a special circumstance." But this analysis is inadequate. To be sure, a murder meeting these criteria is different from one that does not, as a murder in summer is different from one in winter. But to meet constitutional requirements, the difference must be such that murder while lying in wait deserves a punishment far more severe than an otherwise identical murder which does not involve lying in wait. *Morales* made no attempt to show that a murder by lying in wait is more heinous than an "ordinary" murder, or that the difference, if any, is sufficient to justify the disparity in penalty.

Consider, for example, the following comparison: Killer A learns that the victim will be at a certain place, goes directly there, and shoots the unsuspecting victim in the back. Killer B does the same, except that the victim is delayed, and B must wait for a substantial period for the victim to appear. Under *Morales*, B commits the special circumstance of lying in wait, but A does not. Yet would anyone claim on these facts that B deserves a far more severe punishment than A?

*Morales* listed three criteria for the lying in wait special circumstance, but those criteria do not fulfill the constitutional test. The first criterion listed in *Morales*, concealment of purpose, is, as *Morales* itself noted, characteristic of many "routine" murders. The second—a period of watching and waiting—is the key element in lying in wait when that concept is used to prove premeditation, but is of no significance in connection with special circumstances. As I have said, there seems no reason to punish more severely the killer who waits for his victim than the killer who hunts down the victim. The last criterion—a surprise attack on an unsuspecting victim from a position of advantage—adds little. Since the first criterion was concealment of purpose, the attack is necessarily a surprise and the victim unsuspecting. The only new element is that the killer occupy a "position of advantage," and no cases tell us what that means. It would seem to me that a premeditating killer confronting an unsuspecting victim always has an advantage.

In the present case, for example, defendant Madrigal preceded the victim down the trail and defendant Webster followed the victim. Both attacked the victim with knives and killed him. The jury found Webster, but not Madrigal, guilty of the special circumstance of lying in wait. Was that because Webster had a "position of advantage" because he was behind the victim, but Madrigal did not? Whether or not that was the jury's reasoning, when two people conspire to kill a victim and attack him simultaneously, does it make any sense to sentence one to be executed on the ground that he alone had a "position of advantage?"

In short, a murder by lying in wait is simply an ordinary premeditated murder in which the killer chooses to wait for his victim to come to him instead of going to the victim. *Morales*, as I have noted, makes no attempt to explain why lying in wait is included in the list of special circumstances. A Court of Appeal case attempted an explanation, but the reasons suggested are so preposterous that the author ends up writing tongue in cheek.

In *Richards* v. *Superior Court, supra*, 146 Cal.App.3d 306, 314, footnote 5, the court speculated that "[o]ne supposes that . . . it is perceived as a particularly cowardly form of murder—hence the opprobrium heaped on the western villain who killed from ambush. And in earlier, more religious times, special scorn was reserved for those who murdered victims in a fashion intended to deprive them of the opportunity for reflection and contrition. Thus, the piteous complaint of Hamlet's father that he was murdered 'in the blossoms of my sin/ Unhousel'd, disappointed, unanel'd/ No reckoning made, but sent to my account/ With all my imperfections on my head . . . .' (Hamlet, act I, scene v., line 66ff.)"

I do not believe the drafters and voters in 1978 included the lying-in-wait special circumstance because of a 400-year-old notion that an honorable killer allows the victim time to confess his sins, or even a 100-year-old notion that a honorable killer waits until the victim has a chance to draw first. In any case, the lying-in-wait special circumstance, as construed in *Morales*, embodied neither notion. To the contrary, *Morales* specifically rejected the contention that the special circumstance only applies if the killer ambushes the victim.

Neither is there any societal consensus that a murder while lying in wait is more heinous than an ordinary murder, and thus more deserving of death. Of the 35 other states imposing the death penalty, only 3 treat lying in wait as either a special circumstance or an aggravating factor. (Colo. Rev. Stat. § 16-11-103(6)(f); Ind. Code Ann. § 35-50-2-9; Mont. Code Ann. § 45-5-102.) Indiana requires that the defendant be physically concealed from the victim. (*Davis* v. *State* (Ind. 1985) 477 N.E.2d 889, 895-896.) Thus there are

at most two other states which would permit imposition of the death penalty for murders falling under the *Morales* criteria; at least forty-seven states would not.

I conclude that the special circumstance of lying in wait, as construed in *Morales*, does not meet minimum constitutional criteria: it does not provide a principled or rational ground for determining which murderers should be death eligible. Lying in wait proves premeditation, and thus proves that a murder is of the first degree. But those first degree murderers who lie in wait are no more deserving of death than those who act with dispatch.

Since the evidence does not support the special circumstance of felony murder, and the special circumstance of lying in wait is constitutionally invalid, we should reverse the penalty judgment.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment. I cannot agree, however, with the majority's treatment of the "immediate presence" element of robbery, and therefore write separately.

Penal Code section 211, defining the crime of robbery, requires that property be taken from the person or immediate presence of the victim through the use of force or fear. In *People* v. *Hayes* (1990) 52 Cal.3d 577, 627 [276 Cal.Rptr. 874, 802 P.2d 376], we held that "immediate presence" means "an area over which the victim, at the time force or fear was employed, could be said to exercise some physical control."

In this case the evidence, viewed in the light most favorable to the prosecution (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), showed that at the time of the attack the victim was approximately one-quarter mile from his car, and was walking down a narrow trail single file with defendant and two others. The majority sets forth two reasons why, in its view, the immediate presence requirement of robbery was met in this case. Neither is convincing.

First, the majority reasons that "[t]he jury could . . . reasonably infer that but for defendant's attack, [the victim's] relative proximity would have allowed him to take effective physical steps to retain control of the vehicle . . . ." (Maj. opn., *ante*, at p. 440.) This reasoning is unpersuasive.

In effect, the majority substitutes a concept of *relative proximity* to the stolen property for the statutory element of *immediate presence*. The defect in the majority's reasoning can be best understood by hypothesizing that at the time of the attack the victim and his attackers were not one-quarter mile but two miles from the car. The majority's reasoning would be equally

applicable to that situation, since one could reasonably infer that but for the attack the victim's "relative proximity" would have enabled him to take effective physical steps to retain control of the vehicle. Yet it cannot be rationally argued that a car two miles from its driver is within the driver's "immediate presence," that is, in an area in which the driver could exercise physical control over the vehicle.

Still another example reveals the defects of the majority's approach. Let us assume that the victim and defendant had merely decided to go for a walk, and that a third party stole the car from the lot where it was parked when the victim was a quarter-mile away. The victim, who was walking away from the car and down a narrow trail with defendant at the time of the theft, would not have known the car was gone until he returned. In other words, in all probability the car would not have been within the victim's sensory perception at the time it was taken. If the "immediate presence" requirement of the robbery statute is not tested by sensory perception, however, then it is difficult to see what it means. For instance, defendant and his companions could have walked with the victim not a quarter-mile, but a mile, or three miles, or five, and apparently the immediate presence requirement would still be met under the majority's approach. The majority's "relative proximity" theory thus nullifies the statutory requirement of immediate presence.

Second, the majority finds the immediate presence requirement of the robbery statute satisfied on a "luring away" theory. Under the majority's approach, robbery is committed when the defendant "uses peaceful means to move the victim away from a place where the victim could physically protect the property, then employs force or fear upon the victim in order to make good the theft or escape." (Maj. opn., *ante*, at pp. 441-442.)

This approach presumes that the elements of robbery can occur over a theoretically limitless time span. But less than 10 months ago, the members of this court unanimously agreed that the term immediate presence means "an area over which the victim, *at the time force or fear was employed*, could be said to exercise some physical control." (*People* v. *Hayes, supra,* 52 Cal.3d at p. 627, italics added.) The majority's conclusion in this case—that a defendant who lures the victim away from the immediate presence of the property, then employs force or fear, can be guilty of robbery—directly conflicts with this unambiguous language from our recent decision in *Hayes.*

The majority correctly finds that the evidence supports a conclusion that the key to the victim's car was taken from his person by means of force or fear. But because, as the majority observes, we cannot be certain under the

circumstances of this case that the jury based its robbery finding on the taking of the key and not the car, this rationale alone cannot support the robbery special circumstance. (See *People* v. *Green* (1980) 27 Cal.3d 1, 70 [164 Cal.Rptr. 1, 609 P.2d 468].) Accordingly, I would strike the robbery special circumstance, and affirm the death verdict in this case based solely on the lying-in-wait special circumstance.

Appellant's petition for a rehearing was denied November 20, 1991. Mosk, J., was of the opinion that the petition should be granted.