Filed 5/24/13  P. v. Cabrera CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JERRY CABRERA,<br><br>      Defendant and Appellant. | B233111<br><br>(Los Angeles County<br>Super. Ct. No. VA108103) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Cowell, Judge.  Affirmed.

        William Pitman, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Tasha G. Timbadia and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Anthony Jerry Cabrera, appeals his conviction for voluntary manslaughter with an enhancement for use of a deadly or dangerous weapon (Pen. Code, §§ 192, 12022, subd. (b)(1)).[1] He was sentenced to state prison for 11 years.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On the night of October 18, 2008, Rebecca V. went to a party in Hawaiian Gardens. She drove her brother Victor's car to the party without his permission. Once there, she met up with Danny Valdez, whom she knew from high school. Rebecca's other brother, Marco, did not approve of Danny and had previously told her to stay away from him.

Shortly after arriving at the party, Rebecca and Danny drove to a nearby grocery store where they met defendant Cabrera and his girlfriend, Ashley. Ashley was over 21 and therefore able to buy alcohol. The four of them went in and bought a bottle of vodka. As they were leaving the store, Rebecca saw Marco and his friend Jose "Joey" Garcia approaching from the parking lot. Rebecca told Danny, "Just let me talk to my brother. Don't say anything." Cabrera was standing right next to Rebecca when she referred to Marco as her brother.

Marco was upset and shouting. He said to Rebecca, "[W]hat the fuck are you doing with him." Marco was also yelling at Danny and Cabrera, "talking shit" and saying things like "[Y]ou want to fight me?" and "I'm not scared of you." Rebecca was worried because Marco had a short temper and she didn't know what he might do. Rebecca also heard Marco say, "These are the guys that jumped me."

At one point, Rebecca grabbed Marco's wrists and he yelled at her to let him go. Rebecca was four feet 11 inches tall and weighed 120 pounds, while Marco was five feet six inches tall and weighed 185 pounds. Marco was a "big guy" who was "pretty buff."

---

[1]    All further references are to the Penal Code unless otherwise specified.

Rebecca noticed something was going on between Cabrera and Joey, but she could not see them clearly because Marco was standing in front of her. Cabrera then came toward them and swung his fist. Marco pushed Rebecca away and she fell down. While she was on the ground she saw Joey "passed out on the floor." When Danny and Ashley helped Rebecca to her feet, she told them to leave her alone. Cabrera, Ashley and Danny ran off.

Marco told Rebecca to call the police because Joey was hurt. Right after that, Marco collapsed on top of Joey. Rebecca could see blood soaking through Marco's shirt.

Rebecca testified she never screamed for help during her argument with Marco and that she had not been afraid he was going to hurt her. She testified Marco did not push, hit or choke her during the incident. She did not hear Marco tell Joey to "get that guy" or "go get him."

Marco was pronounced dead at the scene. He had sustained three sharp force entry wounds, two in the upper chest and one in the chin. One of the chest wounds had punctured the superior vena cava, "the largest vein draining blood from the head and neck region." The pathologist described this wound as "rapidly fatal."

Joey Garcia testified he and Marco had gone to a billiards club earlier that evening where they drank beer. From there they went to Marco's house, but then decided to buy more beer. Before leaving for the grocery store, they talked to Marco's brother, Victor, about whether Rebecca had taken his car without permission or if it had been stolen. Marco and Joey then drove to the store. According to Joey, Marco was not annoyed or upset at this point. In the parking lot, they saw Victor's car.

Marco asked Joey to call Victor to say they'd found his car. While Joey was making the call on his cell phone, Marco was walking toward the store and Joey was walking just behind him. Joey testified that after he put his cell phone away he kept his hands in the pockets of his jacket. When Rebecca came out of the grocery store, Marco went up to her and yelled, "[W]hat the fuck are you doing with these guys . . . take your ass home." Then Marco said, "Hey, Joey these are the guys that jumped me." Cabrera responded by saying, "[W]hat the fuck are you going to do about it." Joey also heard

Danny say something like, "[W]ho the fuck do you think you are. You're not her father. You can't tell her what to do."

Joey started walking toward Cabrera because Cabrera had insulted them. Joey did this on his own initiative; Marco did not tell Joey to "go get him." Joey's intention was "to make a statement" because Cabrera and Danny were "trying to intimidate" them. Joey still had his hands in his jacket because he was cold. Cabrera took something shiny from his pocket and swung his right arm toward Joey, who raised his left forearm to "block [Cabrera's] strike." Their forearms collided. Joey heard Marco say, "Hey, Joey watch out," and then someone hit Joey from behind. He tried to get up, but he was hit again and knocked unconscious. A surveillance camera in the grocery store parking lot, on which much of the incident had been captured, apparently recorded Danny punching Joey and then kicking him while he was on the ground. When Joey regained consciousness, Marco was lying on top of him. There was blood coming out of Marco's mouth.

Joey testified he did not have a weapon that night. He did not see Marco with a weapon, and he did not know Marco to carry weapons.

2. *Defense evidence.*

Cabrera testified in his own behalf. That night, he picked up his girlfriend Ashley from work and drove to a restaurant. Cabrera's stepbrother Danny Valdez called to say he was with a girl and they wanted to buy alcohol. Cabrera agreed to meet them at a grocery store. When Cabrera and Ashley arrived, Danny introduced them to Rebecca. Inside the store, Danny and Rebecca picked out a bottle of vodka which Ashley purchased.

As the group was leaving the store, they were approached by Marco and Joey. Cabrera had never seen them before; he denied having ever had an altercation with Marco. Marco was being loud and verbally abusive to Danny and Rebecca, which made Cabrera uncomfortable and nervous. Marco was "[g]etting out of control," and "appeared very angry, like he was looking for trouble." Cabrera did not realize Marco

4

was Rebecca's brother; he thought Marco might be her boyfriend and that he was angry because she was with Danny.  Marco and Rebecca were yelling at each other.

Cabrera noticed that Joey "had something in his hand and he put it in his pocket":

"Q.  And how did that make you feel when that happened?

"A.  It scared me.

"Q.  And why was that?

"A.  Because he just . . . put it in his pocket and then he turned around and looked at me.

"Q.  And you saw an object in his hand?

"A.  Yes.

"Q.  Did you know what the object was?

"A.  No.  It was too quick.  I didn't see it in time.

"Q.  So you couldn't tell . . . what it was?  It was just some object in his hand?

"A.  Yeah, it was something.  I didn't know what it was."

Marco turned around and told Joey, "Get this guy," and Joey began walking toward Cabrera.  Joey looked upset and mad:

"Q.  And what were you thinking . . . as this person was walking towards you? "[¶] . . . [¶]

"A.  . . . I knew he was coming to hurt me.  I thought he was coming to do something to me or to my girlfriend."

In his pocket, Cabrera had a small pocket knife with a three- or four-inch blade. As Joey got closer to Cabrera:

"A.  I just backed up, I backed away from him.

"Q.  What did you do?

"A.  I reached for my knife.

"Q.  Why did you reach for the knife?

"A.  I don't . . . know exactly.  I mean I don't know exactly why I reached for it. I just did it.

"Q.  Were you scared?

"A. Yes.

"Q. And why were you scared?

"A. He was coming at me and I seen something in his hand. And I knew he had something in his pocket."

In the next instant, Cabrera had swung his knife at Joey:

"A. I just seen [Joey] pull his hands out of his pockets very fast . . . and he made a quick movement toward me with one of his arms.

"Q. And what did you do?

"A. I swung with the hand that had my knife in it."

Cabrera testified their forearms collided and he retreated as Joey continued to come toward him. Then Cabrera noticed Marco "had [Rebecca] by her neck and by her hair." Rebecca was grabbing Marco's sleeve and trying to push him away. Both Marco and Rebecca were screaming and cursing. "It looked like [Marco] was hurting her. Looked like he was beating her up." Marco's hands were "all over her neck and her face and her hair" and "[i]t looked to me like he was trying to strangle her or choke her." Cabrera grabbed Marco's shoulder and that's when the fatal stabbing occurred:

"A. [Marco] swung at me with his right hand, with the back of his fist, and he hit me.

"Q. And what happened then?

"A. He just turned around, took a step and lunged at me.

"Q. What did you do?

"A. At that point, I pushed my hand on his shoulder and I stabbed him. [¶] . . . [¶]

"Q And how many times did you stab him?

"A. I only remember doing it twice.

"Q. Where did you stab him, what part of the body?

"A. In his chest.

"Q. And did you ever stab him in his chin?

"A. I don't remember that happening, but I know it happened.

6

"Q. And at the time that you stepped in what was your intent? What were you intending to do when you stepped into that fray?

"A. All I was trying to do was to get him to stop hurting her.

"Q So were you trying to separate them or –

"A. Just get him off her, just to separate them.

"Q. In your mind was this moving quick, was it moving slow?

"A. It all happened very fast.

"Q. And were you intending to kill him when you stabbed him?

"A. No, sir.

"Q. Were you intending to injure him?

"A. No.

"Q Were you conscientiously [*sic*] thinking about what you were doing at that point in time?

"A. No, I wasn't thinking.

"Q. Would you say you were aware of what you were doing at that point in time?

"A. No, I wouldn't say that."

Cabrera also described the stabbing this way: "[Marco] hit me and I just reacted and I stabbed him." "[H]is arm is coming this way so, I put my hand up and it only gets about this far. And then I just stabbed him . . . ."

"A. [Marco] was cursing at [Rebecca] when I grabbed him. And he turned around and hit me. . . . And I stabbed him and then after that he kept cursing, but it was more towards me I think after that."

"Q. Did you know that you stabbed him when you stabbed him?

"A. Did I actually know that it happened?

"Q. Yeah?

"A. I wasn't really thinking it through, but when I walked away, yes, I knew I stabbed him.

"Q. At the moment when you were stabbing him did you know you were stabbing him?

7

"A. I didn't really think about it.

"Q. You didn't think about it before you stabbed somebody?

"A. No, I didn't think about it. There was not enough time to think about what was going on."

After stabbing Marco, Cabrera fled with Danny and Ashley. He later threw the knife away because he was scared; he did not feel good about what had happened and he didn't want the knife near him.

Dr. Scott Fraser, a professor of neuropsychology who teaches at UCLA and USC medical schools, explained the "flight or fight" syndrome and the effects of stress on human reactions to frightening situations. People faced with potentially dangerous situations experience a series of automatic physiological reactions, including an increased blood flow to the skeletal muscular system along with a compensating decreased blood flow to the brain's frontal cortex. The frontal cortex "is the major area where decision making occurs, where we monitor our behavior, where we evaluate the consequences of potential actions." In such situations, a "survival instinct" is triggered and a person is more likely to interpret actions and objects as threatening and dangerous. Dr. Fraser opined these physiological reactions could have been triggered by someone in Cabrera's position the night of the stabbing.

3. *Rebuttal evidence.*

Craig Ditsch of the Los Angeles County Sheriff's Department was one of the lead investigators on the case. The first time he interviewed Rebecca, which was about seven hours after the stabbing occurred, he did not see a single scratch, red mark, bruise, or other type of injury on her. She did not have torn clothing or look disheveled. In fact, Ditsch was struck by "how neat her hair was. Every hair was in place like she just got home from a date."

**CONTENTION**

The trial court erred by refusing to instruct on involuntary manslaughter as a lesser included offense of murder.

**DISCUSSION**

Cabrera contends his conviction must be reversed because the trial court should have instructed the jury on involuntary manslaughter based on an imperfect self-defense theory. This claim is meritless.

1. *Background.*

Cabrera and Danny Valdez were jointly charged with murdering Marco and assaulting Joey Garcia. Danny pled guilty to the assault and only Cabrera went to trial. Cabrera was acquitted of assaulting Joey, but convicted of voluntary manslaughter for Marco's death.

At trial, during a discussion about which jury instructions to use, Cabrera asked for an involuntary manslaughter instruction on the theory he had acted in imperfect self-defense and, therefore, the killing of Marco had been without malice.

The trial court rejected the request: "Well, it's not just the absence of malice. But as we discussed at length in chambers and this obviously was not on the record, it was a discussion with counsel. Everyone seemed to agree and [what] the discussion focused on, was the phrase 'conscious disregard for life.' [¶] It's your contention . . . the jury can find there was no conscious disregard for life on the part of your client. And [the prosecutor's] contention and the one that I agree with, is that when you take a knife and you stab someone in the chest, there is a conscious disregard for life unless you have evidence, one that he was unconscious or the motion was involuntary or some evidence to the effect. Just simply saying I wasn't thinking about what I was doing I don't think takes it out of the level that you're entitled to ask the jury to find there was no conscious disregard for life. [¶] He testified he intentionally took the knife out, he opened the blade, he swung the knife, and . . . he admits stabbing the person . . . twice in the chest. [¶] Now obviously it was three times because there were three puncture wounds, three separate wounds. *But I don't see how any way under that set of facts that one can argue*

9

*that there is no conscious disregard for life. And that's the element that prevents it from being an involuntary manslaughter.* [¶] So your objection is noted for the record, but the court is going to instruct the jury on second degree murder as requested by the People and on the lesser included offense of voluntary manslaughter." (Italics added.)

       2. *Legal principles.*

       "When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so. [Citations.]" (*People v. Webster* (1991) 54 Cal.3d 411, 443.) In this context, "substantial evidence" is evidence from which reasonable jurors could conclude the lesser offense, but not the greater, had been committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

      In *People v. Blakeley* (2000) 23 Cal.4th 82, our Supreme Court explained the difference between murder and the lesser included offense of manslaughter: "Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a).) Malice may be either express or implied. It is express when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.' (§ 188.) It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (*Ibid*.) This statutory definition of implied malice, we have said, 'has never proved of much assistance in defining the concept in concrete terms' [citation], and juries should be instructed that malice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]. . . . [F]or convenience we shall describe this mental state as 'conscious disregard for life.' [¶] Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the

10

defendant kills in "unreasonable self-defense" – the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.]" (*People v. Blakeley, supra*, 23 Cal.4th at pp. 87-88, fn. omitted.)

*Blakeley* then framed the question before it this way: "A person who *intentionally* kills in unreasonable self-defense lacks malice and is guilty only of voluntary manslaughter, not murder. [Citations.] But what offense is committed when a person, acting with a conscious disregard for life, *unintentionally* kills a human being, but the killing occurs in unreasonable self-defense? Is the killer guilty of murder, voluntary manslaughter, or involuntary manslaughter?" (*People v. Blakeley, supra*, 23 Cal.4th at p. 88.) *Blakeley*'s answer was: "Here, we hold in a case of first impression that voluntary manslaughter is also committed when a defendant, acting with conscious disregard for life and the knowledge that the conduct is life-endangering, unintentionally but unlawfully kills while having an unreasonable but good faith belief in the need to act in self-defense." (*Id*. at p. 85.)

3. *Discussion*.

Citing *Blakeley*, Cabrera contends there was substantial evidence to support an involuntary manslaughter instruction in his case. This claim is meritless, for both legal and factual reasons.

Cabrera's first error is legal because he has misconstrued what the Supreme Court said in *Blakeley*. Cabrera asserts the *Blakeley* majority held that " 'when a defendant, acting with a conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary rather than involuntary manslaughter.' [Citation.] Notably, *however*, the Court acknowledged, while discussing Justice Mosk's dissent, that *it had 'no quarrel' with the view that a defendant 'who kills in unreasonable self-defense may sometimes be guilty of involuntary manslaughter*.' [Citation.] Justice Mosk distinguished between persons who with an actual, but unreasonable belief in imminent danger of death or great bodily harm, act with malice aforethought, either express or implied, and those who act 'without due caution and circumspection.' [Citation.] The latter category, in Justice Mosk's view would be guilty of involuntary manslaughter,

11

while the former guilty of voluntary manslaughter.  [Citation.]  *Accordingly, the* <u>*Blakeley*</u> *court concluded that the trial court erred 'by failing to instruct the jury that an unintentional killing in unreasonable self-defense is involuntary manslaughter*."  (Italics added.)

Neither italicized portion of Cabrera's assertion is correct.

What the *Blakeley* majority actually said, after noting Justice Mosk's dissent, was this:  "We have no quarrel with this view.  We conclude only that a defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter."  (*People v. Blakeley, supra*, 23 Cal.4th at p. 91.)  Justice Mosk agreed with this statement:  "For my part, I have no quarrel with their view."  (*Id.* at p. 99, fn. 2 (dis. opn. by Mosk, J.).)  Hence, Justice Mosk agreed with the majority's holding that a defendant acting in imperfect self-defense *and* with a conscious disregard for life commits voluntary manslaughter, not involuntary manslaughter.[2]  The fact the majority had no quarrel with Justice Mosk's view – that a defendant acting in imperfect self-defense but with something less than conscious disregard for life, e.g., mere negligence, would only be guilty of involuntary manslaughter – is simply irrelevant to Cabrera's case.

In addition, Cabrera's statement, that "accordingly" the *Blakeley* majority concluded the trial court had erred by not instructing on involuntary manslaughter, completely misses the majority's holding there was trial court error *only* because of a retroactivity problem.  That is, *Blakeley*'s answer to the first-impression question it faced would have constituted an "unforeseen judicial enlargement of the crime of voluntary manslaughter, and thus may not be applied retroactively to defendant."  (*People v.*

---

[2]     Cabrera's reliance on such pre-*Blakeley* cases as *People v. Glenn* (1991) 229 Cal.App.3d 1461, and *People v. Welch* (1982) 137 Cal.App.3d 834, is misplaced because these cases were specifically disapproved by *Blakeley*.  (See *People v. Blakeley, supra*, 23 Cal.4th at p. 91.)

12

*Blakeley, supra*, 23 Cal.4th at p. 92.)[3]  Since Cabrera's offense was committed well after the *Blakeley* decision, the new principle announced there applies to him.

Cabrera's second error is factual because there is no substantial evidence that, in stabbing Marco, he acted with anything other than a conscious disregard for life.  Cabrera agrees "one view of the evidence might support such a finding," but argues "other substantial evidence existed to support a reasonable conclusion that the appellant acted reflexively while brandishing a [knife] and without an intent to kill or a conscious disregard for life."  We disagree.

If by "reflexively" Cabrera means there was evidence he acted either unconsciously or accidentally, the overwhelming weight of the evidence was to the contrary.  Cabrera's own testimony shows he was fully cognizant of what he was doing when he stabbed Marco, that it had been an intentional and deliberate act, and that the stabbing had not been accidental.  Cabrera was very clear he knowingly stabbed Marco out of fear and because he believed it was necessary to protect Rebecca and/or himself.

Although Cabrera occasionally testified that when he stabbed Marco he "didn't really think about it" and he "wasn't thinking," the overwhelming weight of his testimony demonstrated he had been acting intentionally.  Describing his encounter with Joey, Cabrera testified that when he saw Joey pull his hands from his jacket and make an arm movement, he "swung with the hand that had my knife in it."  Similarly, when Marco lunged at Cabrera:  "I stabbed him."  "And then I just stabbed him . . . ."  "[Marco] turned around and hit me. . . .  And I stabbed him and then after that he kept cursing . . . ."  "I wasn't really thinking it through, but when I walked away, yes, I knew I stabbed him."

Indeed, defense counsel's closing statement tried to argue around this evidence showing Cabrera had stabbed Marco intentionally.  Counsel argued Cabrera "saw and heard what appeared to be a young woman getting beat up and injured and instinctively reacted."  "[Cabrera] sees this buff big strong guy and this girl and they are getting

---

[3]     The majority went on to find the error had been harmless.  Justice Mosk dissented because he would have found the error prejudicial.  (See *People v. Blakeley, supra*, 23 Cal.4th at pp. 93-94; *id*. at pp. 99-100 (dis. opn. by Mosk, J.).)

physical and there's a physical confrontation going on. And one second passes and he reacts. He thinks because of what he heard, because of what he saw, because he just got attacked by this guy Joey, that something crazy's going on. That this guy is hurting [Rebecca]. And he sees that and he acts. He reacts. It's not a decision . . . like I think I'll step in there and maybe do something. He reacts because he thinks this girl is going to suffer great bodily injury. He's on auto pilot. It's automaticity. He scared for her." "He wasn't acting in conscious disregard [for life]. . . . [T]here was no conscious disregard. There was no thought process. *The thought process was I see a girl getting beat up by a big buff guy and I'm acting. That's what happened.*" (Italics added.)

Cabrera may have been afraid. In the heat of the moment, he may have believed his violent intervention was necessary to protect Rebecca or himself. There is, however, no doubt that he knowingly and intentionally stabbed Marco. Cabrera offers absolutely no authority or reasoned argument to support the proposition that this sort of "reflexive" or "instinctual" killing is not done with a conscious disregard for life. As the trial court said: "[W]hen you take a knife and you stab someone in the chest, there is a conscious disregard for life unless you have evidence, one that he was unconscious or the motion was involuntary or some evidence to the effect. Just simply saying I wasn't thinking about what I was doing . . . [does not entitle you] to ask the jury to find there was no conscious disregard for life. [¶] He testified he intentionally took the knife out, he opened the blade, he swung the knife, and . . . he admits stabbing the person . . . twice in the chest."

Cabrera's case is essentially the same as *People v. Garcia* (2008) 162 Cal.App.4th 18, where Garcia hit the victim, Gonzalez, in the face with the butt of a shotgun, causing Gonzalez to fall, hit his head on the sidewalk and die. Garcia testified "Gonzalez had lunged toward him and . . . he thought Gonzalez was going to try to fight him and was concerned Gonzalez would take the gun," so Garcia " 'just reacted' and . . . [he] jabbed or swung at Gonzalez to back him up. He did not intend to hit Gonzalez in the face and 'never intended to kill him or for him to die.' " (*Id*. at p. 25.) The trial court refused to instruct on involuntary manslaughter as a lesser-included offense, reasoning Gonzalez

14

had died "as the direct result of an inherently dangerous felony such as assault with a deadly weapon or assault with a firearm." (*Id*. at p. 26.) The court of appeal affirmed: "Absent proof of malice – whether because malice was negated by provocation or the doctrine of imperfect self-defense or because of an absence of proof that 'the circumstances attending the killing show[ed] an abandoned and malignant heart' [citation] – Garcia committed manslaughter, 'the unlawful killing of a human being without malice.' [Citations.] Because Gonzalez's death did not occur in the commission of either a dangerous misdemeanor [citation], or a lawful act in an unlawful manner or without due caution and circumspection, it does not fall within the statutory definition of involuntary manslaughter [citation]. [¶] . . . [I]n light of the undisputed evidence Garcia assaulted Gonzalez with a deadly weapon/firearm, knocking him to the sidewalk where he hit his head and died, there was not sufficient evidence in this case the killing of Gonzalez was involuntary manslaughter. Accordingly, no involuntary manslaughter instruction was required." (*Id*. at pp. 32-33.)

In his own testimony, Cabrera acknowledged knowingly and deliberately stabbing Marco because he believed it was necessary to save himself and/or Rebecca from harm. The other evidence at trial also showed the stabbing had been intentional, and hence there was no evidence from which the jury could have concluded Cabrera was acting without a conscious disregard for life. "[V]oluntary manslaughter, but no lesser offense, is . . . committed when one kills unlawfully, and with *conscious disregard for life*, but lacks malice because of provocation or imperfect self-defense." (*People v. Rios* (2000) 23 Cal.4th 450, 461, fn. 7.) Because there was no substantial evidence from which the jury could have reasonably concluded Cabrera committed involuntary manslaughter, there was no error in not giving a lesser included offense instruction. (See *People v. Webster, supra,* 54 Cal.3d at p. 443.)

15

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KLEIN, P. J.

We Concur:

KITCHING, J.

ALDRICH, J.